RICHARD TAN, SBN 327366
LAW OFFICES OF RICHARD TAN
3020 Bridgeway, Suite 192
Sausalito, CA  94965
Telephone: (510) 345-3246
Facsimile: (415) 532-1310
Email: richardtan@tutanota.com

Attorneys for Plaintiffs,
KEITH H. WASHINGTON,
SAN FRANCISCO BAY VIEW
NATIONAL BLACK NEWSPAPER

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WASHINGTON, KEITH H. and SAN FRANCISCO BAY VIEW NATIONAL BLACK NEWSPAPER,<br><br>　　　　Plaintiffs,<br><br>　　　　vs.<br><br>FEDERAL BUREAU OF PRISONS, GEO CALIFORNIA, INC., MONICA HOOK, MARIA RICHARD and WILL GOMEZ,<br><br>　　　　Defendants. | Case No.:<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE AND FOR PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

# Contents

INTRODUCTION ...................................................................................1

STATEMENT OF FACTS.................................................................... 2

    I. Background............................................................................ 3

    II. The COVID-19 Outbreak at the Taylor Street Center ..................... 3

    III. The Retaliation Against Mr. Washington ...................................... 6

LEGAL ARGUMENT..........................................................................10

    I. Plaintiff, Keith H. Washington, Is Likely to Succeed on the Merits of His
       Constitutional Claim ........................................................... 11

      A. Defendants Took Adverse Action Against Mr. Washington Because of His
         Protected Conduct, Chilling His Exercise of First Amendment Rights.....12

      B. No Legitimate Correctional Purpose is Served By the Action ..................16

    II. Plaintiff, SF Bay View, is Likely to Succeed on the Merits of Its Constitutional
       Claim .................................................................................18

      A. The SF Bay View Engaged in Constitutionally Protected Activity............18

      B. The Activity was a Substantial or Motivating Factor in Defendants'
        Conduct ..........................................................................18

      C. Defendants' Actions Would Chill a Person of Ordinary Firmness From
        Continuing to Engage in the Protected Activity......................................19

    III. Plaintiffs Have Been, and Will be, Irreparably Harmed if this Court Does Not
       Protect their Constitutional Rights by Issuing a Temporary Restraining
       Order.................................................................................19

    IV. The Balance of Equities Weighs in Plaintiffs' Favor as it is Always in the
       Public Interest to Protect Constitutional Rights........................................... 20

    V. Exhaustion Under the Prison Litigation Reform Act Does Not Apply ........ 22

      A. A Textual Exception to the PLRA's Exhaustion Requirement Applies. 22

B.  PLRA Exhaustion Does Not Apply to the SF Bay View .......................... 24

CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Alliance for Wild Rockies v. Cottrell,*
    632 F. 3d 1127 (9th Cir. 2011)...............................................................10

*Associated Press v. Otter,*
    682 F. 3d 821 (9th Cir. 2012) ...............................................................19

*Bartnicki v. Vopper,*
    532 U.S. 514 (2001) ...............................................................................15

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ...............................................................................18

*Branzburg v. Hayes,*
    408 U.S. 665 (1972)...............................................................................15

*Bruce v. Ylst,*
    351 F. 3d 1283 (9th Cir. 2003) .................................................13, 16, 17

*Cameron v. Bouchard,*
    462 F. Supp. 3d 746 (E.D. Mich. 2020) ...............................................21

*Citizens United v. Federal Election Com'n,*
    558 U.S. 310 (2010) ...............................................................................18

*Cmty. House, Inc. v. City of Boise,*
    490 F. 3d 1041 (9th Cir. 2007)............................................................. 20

*Cuviello v. City of Vallejo,*
    944 F. 3d 816 (9th Cir. 2019). ............................................................ 20

*Drakes Bay Oyster Co. v. Jewell,*
    747 F. 3d 1073 (9th Cir. 2014)............................................................. 20

*Franklin v. Murphy,*
    745 F. 2d 1221 (9th Cir. 1984). ...........................................................12

*Grosjean v. American Press Co.,*
    297 U.S. 233 (1936) ...............................................................................18

*Hernandez v. Sessions,*
　　872 F. 3d 976 (9th Cir. 2017)...........................................................11

*Jones v. Bock,*
　　549 U.S. 199 (2007)...................................................................22

*League of Wilderness Defs/Blue Mountains Biodiversity Project v. Connaughton,*
　　752 F. 3d 655 (9th Cir. 2014)..........................................................20

*Maney v. Brown,*
　　474 F. Supp. 3d 1191 (D. Or. 2020) ..................................................23

*Melendres v. Arpaio,*
　　695 F.3d 990 (9th Cir. 2012)..........................................................20

*Morrison v. Hall,*
　　261 F. 3d 896 (9th Cir. 2001),........................................................17

*Nieves v. Bartlett,*
　　139 S. Ct. 1715 (2019)................................................................19

*Pell v Procunier,*
　　417 U.S. 817 (1974) ..................................................................12

*Perez v. Wolf,*
　　445 F. Supp. 3d 275 (N.D. Cal. 2020) .................................................21

*Pratt v. Rowland,*
　　65 F. 3d 802 (9th Cir. 1995). .....................................................12, 16

*Procunier v. Martinez,*
　　416 U.S. 396 (1974)..................................................................13

*Rhodes v. Robinson,*
　　408 F. 3d 559 (9th Cir. 2005) ...............................................12, 15, 19

*Rizzo v. Dawson,*
　　778 F. 2d 527 (9th Cir. 1985)...............................................11, 16

*Ross v. Blake,*
　　136 S.Ct. 1850 (2016)................................................................22

*Sampson v. Cty. of Los Angeles*,

     974 F. 3d 1012 (9th Cir. 2020) ...........................................................18

*Sowell v. TDCJ*,

     2020 U.S. Dist. LEXIS 77809 (S.D. Tex. 2020)...................................... 24

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

     240 F. 3d 832 (9th Cir. 2001)..............................................................10

*Thornburgh v. Abbott*,

     490 U.S. 410 (1989).............................................................................17

*Valdez v. Rosenbaum,*

     302 F. 3d 1039 (9th Cir. 2002) ...........................................................12

*Valentine v. Collier*,

     140 S. Ct. 1598 (2020) ........................................................................ 24

*Valentine v. Collier,*

     2020 U.S. Dist. LEXIS 178652 (S.D. Tex. 2020) ....................................21

*Valentine v. Collier*,

     208 L. Ed. 2d 415 (2020) .................................................................... 24

*Warsoldier v. Woodford*,

     418 F. 3d 989 (9th Cir. 2005)............................................................. 20

*Watison v. Carter*,

     668 F. 3d 1108 (9th Cir. 2012) ............................................................16

*Winter v. Nat. Res. Def. Council, Inc.*,

     555 U.S. 7, 20 (2008) ..........................................................................10


**Statutes**

28 C.F.R. § 540.52(e) ..................................................................... 9

28 C.F.R. § 541.1 ...........................................................................12

28 C.F.R. § 542.18 ......................................................................... 23

42 U.S.C. § 1997e(a) ................................................................................................. 22, 25

**INTRODUCTION**

Plaintiffs, Keith H. "Malik" Washington and the San Francisco Bay View National Black Newspaper ("SF Bay View"), hereby request this Court to issue a Temporary Restraining Order and/or Order to Show Cause and, following hearing, a Preliminary Injunction, mandating that the defendants and all persons acting with them or under their control take the following actions:

1.    Revoke the disciplinary sanction against Mr. Washington, Report No. 3466318, and remove the sanction from Mr. Washington's record;

2.    Restore Mr. Washington's good time credits (14 days), which have delayed his expected date for home confinement and expected release date;

3.    Return Mr. Washington's cell phone to him.

Plaintiffs further request this Court to issue a Temporary Restraining Order and/or Order to Show Cause and, following hearing, a Preliminary Injunction, prohibiting the defendants and all persons acting with them or under their control from:

4.    Enforcing the requirement that Mr. Washington fill out a "News Interview Authorization Form" before he speaks with members of the press;

5.    Enforcing any restrictions on Mr. Washington's ability to speak with other members of the press;

6.    Retaliating, whether via inmate discipline or other means, against Mr. Washington for speaking with members of the press, until his pre-release status ends.

This motion will be made on the grounds that immediate and irreparable injury will result to plaintiffs unless the activities described above are enjoined pending

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

trial of this action, and will be based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the declarations of Mary Ratcliff, Alexis Terrazas and Steve Zeltzer.

### STATEMENT OF FACTS

Shortly before January 8, 2021, a COVID-19 outbreak began at the Taylor Street Center located in the Tenderloin, in the heart of San Francisco – an outbreak which, as of this writing, is still ongoing. Because Plaintiff, Keith H. "Malik" Washington, exposed this outbreak in his role as Editor-in-Chief of Plaintiff, the San Francisco Bay View National Black Newspaper ("SF Bay View"), Mr. Washington was retaliated against by the Federal Bureau of Prisons ("BOP"), acting through their contractor, the GEO Group, Inc. ("GEO Group"). Mr. Washington and the SF Bay View seek relief from this Court to vindicate their free speech rights.

The Taylor Street Center is a private prison facility operated by the GEO Group. It is a Residential Reentry Center - a minimum security facility without cells, bars or armed prison guards. Such centers facilitate prisoners' reentry into society by placing them in a transitional situation, in which they can seek gainful employment and integrate into the wider community.

Mr. Washington was transferred to the Taylor Street Center in September 2020, when he entered pre-release status on his federal sentence. As part of his pre-release, he is authorized to work as a journalist and editor of the SF Bay View, the most visited Black newspaper on the internet. When a non-confidential memo concerning the outbreak was circulated to facility residents, Mr. Washington publicized and covered the developing outbreak – an outbreak which GEO Group denied.

For doing so, he was punished by defendants.

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 2

## I.  Background

Keith H. "Malik" Washington was placed in pre-release status on September 3, 2020 and confined at the Taylor Street Center. (Declaration of Mary Ratcliff, ¶ 10.) As part of his pre-release, he is permitted to work as the editor-in-chief of the SF Bay View, located in the Bayview-Hunters Point district of San Francisco. (Complaint, ¶ 10, 31.)  The SF Bay View is the most visited Black newspaper on the internet. (Declaration of Mary Ratcliff, ¶ 3.)

The Taylor Street Center is operated by GEO California, Inc. ("GEO Group"), a private corporation operating under a contract with the Federal Bureau of Prisons.[1] The facility contains 140 beds for federal prisoners, and 100 beds for state prisoners via a contract with the California Department of Corrections and Rehabilitation.

Typically, Mr. Washington departs the Taylor Street Center at about 7 a.m. every morning, taking the bus to the SF Bay View offices. (Complaint, ¶ 10.) He returns at about 8 p.m. in the evening. *Id.*

Plaintiff Washington's duties as Editor-in-Chief also include developing and writing stories and story ideas. (Declaration of Mary Ratcliff, ¶ 22.) The Editor-in-Chief also processes and routes, when appropriate, emails which the SF Bay View receives to the appropriate staff person to process. (Declaration of Mary Ratcliff, ¶ 19.) The SF Bay View receives approximately 500 emails a day. *Id.* Mr. Washington performs this function both at work and after hours, following his return to the Taylor Street Center in the evenings, on his cell phone.

A crucial component of Plaintiff Washington's duties as Editor-in-Chief is building relationships with other reporters, news editors and organizations in the

---

[1]   https://www.bop.gov/locations/rrc/index.jsp?contract=DJB200264

community. (Declaration of Mary Ratcliff, ¶ 24.) This includes developing story ideas, research and investigation. *Id.* Mr. Washington collaborated with other reporters on a story documenting incidents of racism in the San Francisco Health Service System. (Declaration of Steve Zeltzer, ¶ 3-6.) He also participated in a media partnership documenting the effects of COVID-19, systemic racism, police brutality and other issues on communities in the Bay Area. (Declaration of Alexis Terrazas, ¶ 5-10.)

Mr. Washington and his fiancée rent an apartment approximately three minutes' walk from the SF Bay View offices. (Declaration of Mary Ratcliff, ¶ 28.) The conditions of his pre-release do not permit him to go to his apartment. (Declaration of Mary Ratcliff, ¶ 28.)

## II. The COVID-19 Outbreak at the Taylor Street Center

On Friday, January 8, 2021, a non-confidential memorandum disclosing the existence of a COVID-19 outbreak at the Taylor Street Center was distributed to facility residents. [2] (Complaint, Exhibit A.) The memo was written by Jason Carpenter and defendant Maria Richard, employees of the GEO Group. The memo stated that "We have had a few residents and staff who have recently tested positive for the Covid-19. We have no way of knowing how big [o]r small an outbreak is so we need to take necessary precautions." *Id.*

The positive COVID tests at the Taylor Street Center took place before January 8, 2021. (Complaint, ¶ 30.) The January 8 memo was the first disclosure of the ongoing outbreak by BOP and GEO Group staff. (Complaint, ¶ 28.)

---

[2]    Tim Redmond, *COVID Outbreak – and Media Crackdown – at Private Halfway House in Tenderloin*, 48hills.org (January 11, 2021), https://48hills.org/2021/01/covid-outbreak-and-media-crackdown-at-private-halfway-house-in-tenderloin/

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 4

On the same day, January 8, 2021, at 10:57 a.m., Mary Ratcliff, co-founder of the SF Bay View, emailed Belief Iruayenama, Mr. Washington's case manager at the Taylor Street Center, requesting permission for Mr. Washington to attend a press conference on January 11, 2021 from noon to 1 p.m. (Declaration of Mary Ratcliff, ¶ 15.) The press conference was not related to the COVID-19 outbreak, and concerned whistleblower allegations of racism in the San Francisco Health Service System. (Declaration of Steve Zeltzer, ¶ 3 to 7.)

Belief Iruayenama responded at 12:29 p.m.: "It's fine, he already has a pass for work for that day. So he can go for the Press conference since its in line with his job and its within his work hours." (Declaration of Mary Ratcliff, ¶ 15.)

On the evening of January 8, at 9:45 p.m., Mr. Washington contacted Tim Redmond.[3] Mr. Redmond, a personal friend of Mr. Washington, has been an investigative reporter in San Francisco for more than 30 years. (Complaint, ¶ 32.) He was the past executive editor of the San Francisco Bay Guardian, an alternative newspaper in the Bay Area. *Id.* Mr. Redmond is also the founder of the blog 48hills.org, an independent San Francisco news site. *Id.*

Mr. Washington texted Mr. Redmond stating "COVID outbreak here, Tim." Mr. Redmond responded: "Whoa, can I call you in am?" (48hills Jan 17 article.)

The next day, Saturday, January 9, 2021, the GEO Group placed the Taylor Street Center on lockdown. (Complaint, ¶ 33.) The common areas of the facility were closed down and all residents were confined to their rooms. *Id.* Residents were permitted to leave their rooms only to pick up meals. *Id.*

On the late morning of January 9, 2021, Mr. Washington and Mr. Redmond spoke on the phone about the outbreak at the Taylor Street Center. (48hills January

---

[3]    Tim Redmond, *Bay View Editor May Take Legal Action Against Private Prison Company*, 48hills.org (January 17, 2021), https://48hills.org/2021/01/bayview-editor-may-take-legal-action-against-private-prison-company/  (henceforth "48hills Jan. 17 article").

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 5

17 article.) Subsequently, a public Twitter posting, including a scan of the January 8 memo, appeared online, which Mr. Washington provided to Mr. Redmond. *Id.*

Shortly thereafter, the SF Bay View issued a press release on the outbreak, signed by Nube Brown, Managing Editor at the SF Bay View. (Declaration of Mary Ratcliff, ¶ 16-17.) The press release stated that "[GEO GROUP] has no plans to test the residents until possibly next week." *Id.*

### III.    The Retaliation Against Mr. Washington

At 3:58 p.m. on January 9, 2021, Mr. Redmond sent an email to defendant Maria Richard, the Facility Director of the Taylor Street Center, referring to the press release and inquiring about the outbreak. (48hills January 17 article.)

The email stated:

"Can you tell me if there are currently active cases, and what's being done? Do the people who live there know who has tested positive? Are there any plans to move out of the center people who are close to the end of their probation and have jobs and a place to go?"

Ms. Richard did not respond to Mr. Redmond's email. (48 hills January 17 article.) Instead, approximately three hours later, at 6:47 p.m., defendant Monica Hook, Vice President for Communications at the GEO Group, emailed Mr. Redmond. (48 hills January 17 article.) Instead of disclosing information about the COVID outbreak, Ms. Hook focused her response on discovering the source of Mr. Redmond's information. The full text of Ms. Hook's email was:

"Thank you for your inquiry. From whom did you receive the release and would you please forward that to me? I need some time to get the information you've requested."

In response, Mr. Redmond provided a copy of the press release and the Twitter posting from his Gmail account. (48 hills January 17 article.)

The next day, Sunday, January 10, 2021, at 2:05 p.m., Ms. Hook sent an email to Mr. Redmond stating that "You're also using a Gmail address. With all due respect, you could be anyone." (48 hills January 17 article.) Ms. Hook requested

confirmation of Mr. Redmond's identity. (48 hills January 17 article.) In response, Mr. Redmond provided an email address at 48hills.org. (48 hills January 17 article.)

At 2:56 p.m. on January 10, Ms. Hook sent an email to Mr. Redmond denying that an outbreak had occurred, stating that "There are currently zero staff or resident COVID cases at Taylor Street." (48 hills January 17 article.)

At 3:02 p.m, Mr. Redmond emailed Ms. Hook a copy of the Taylor Street Center's memorandum from the earlier Twitter posting, asking if she believed the memorandum was fraudulent. (48 hills January 17 article.)

At approximately the same time, a GEO Group employee went to Mr. Washington's room at the Taylor Street Center. (Complaint, ¶ 42.) The employee informed Mr. Washington that his approval to attend the press conference on January 11, 2021, which had previously been approved as being "in line with his job and within his work hours," had been revoked. *Id.* The GEO Group employee then showed Mr. Washington a text message from Maria Richard, the facility manager, stating that Mr. Washington's permission to go to the press conference had been revoked. *Id.*

Mr. Washington called his case manager, Belief Iruayenama. (Complaint, ¶ 43.) When asked why the permission to go to the press conference had been revoked, Ms. Iruayenama stated that she didn't know what was going on, and that Maria Richard had intervened. (Complaint, ¶ 43.)

Later that day, between 4:15 and 4:30 p.m., defendant Will Gomez, a GEO Group employee and Case Manager at the Taylor Street Center, searched several rooms in the facility and confiscated a number of cell phones. (Complaint, ¶ 44.) Mr. Washington's phone was confiscated, as well as his roommate's phone. *Id.* Mr. Gomez asked Mr. Washington for the code to unlock the phone, which he provided to Mr. Gomez. *Id.*

All the cell phones which were confiscated were returned after fifteen minutes, except for Mr. Washington's phone. (Complaint, ¶ 44.) Mr. Washington was

informed that he would not be permitted to use other residents' cell phones. *Id*. No collective search of cell phones at the Taylor Street Center had taken place for at least six months prior to this search by Mr. Gomez. (Complaint, ¶ 45.)

At 6:44 p.m., defendant Hook called Tim Redmond on the phone. (48 hills Jan. 17 article.) Contrary to her previous denial, Ms. Hook stated that there were at least three cases of COVID at the Taylor Street Center, and that the people who had tested positive had been moved off site. (48 hills Jan. 17 article.) Ms. Hook again asked Mr. Redmond who had given him the information about the COVID outbreak. (48 hills Jan. 17 article.) Ms. Hook also acknowledged that people living at the Taylor Street Center had cell phones, were permitted to use them, and had every right to communicate with the community. (48 hills Jan. 17 article.)

On Monday, January 11, 2021, Mr. Washington was confined to his room, prevented from going to work, and barred from attending the press conference scheduled at noon. (Complaint, ¶ 51.)

At 11:30 a.m., Mr. Washington was escorted to a boardroom in the Taylor Street Center for a disciplinary meeting with defendant Maria Richard, Director of the Taylor Street Center. (Complaint, ¶ 51.)

Ms. Richard informed Mr. Washington that his cell phone was being confiscated, and would be held for 30 days. (Complaint, ¶ 51.)

Ms. Richard also provided Mr. Washington with a "News Interview Authorization Form". (Complaint, ¶ 52.) Ms. Richard stated that Mr. Washington would not be permitted to have any contact with members of the press unless he obtained prior, written permission from Taylor Street Center staff by filling out the authorization form. *Id*. Ms. Richard stated that approval for the "News Interview Authorization Form" would need to come from Washington, D.C., presumably from unnamed BOP officials. *Id*.

Ms. Richard stated that if Mr. Washington had kept everything quiet about the outbreak, he would not have been disciplined. (Complaint, ¶ 52.)

The original incident report for Mr. Washington's disciplinary sanction was dated January 10, 2021 at 5:00 p.m., and signed by Will Gomez. (Complaint, Exhibit B.) It charges Mr. Washington with a violation of Prohibited Act 327 of BOP's Inmate Discipline Program, Program Statement 5270.09. (Complaint, Exhibit B.)

Prohibited Act 327 is "Unauthorized Contact With the Public". (Complaint, ¶ 49.)

The incident report *explicitly quotes, verbatim and in its entirety*, Mr. Redmond's initial email of 3:58 p.m. on January 9, 2021, inquiring about the COVID outbreak at the Taylor Street Center. (Complaint, Exhibit B.) The incident report also quotes BOP's policy for institutional visits, 28 C.F.R. § 540.62(e), "Interviews by reports and others not included in § 540.2 may be permitted only by special arrangement and with approval of the Warden." (Complaint, Exhibit B.)

Later, on January 11, 2021, defendant Maria Richard revised the incident report during the disciplinary meeting with Mr. Washington. (Complaint, ¶ 53.) Ms. Richard handwrote, on the incident report, an additional violation of Prohibited Act 297 of BOP's Inmate Discipline Program. (Complaint, Exhibit C.) Prohibited Act 297 is "Use of the telephone for abuses . . . which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called." (Complaint, ¶ 55.) On the incident report, the violation is described as "Phone Abuse". (Complaint, Exhibit C.)

Mr. Washington's alleged phone violation was, therefore, retroactively added to the incident report by the facility director after the cell phone search had already occurred. Concern about violations of cell phone rules was not, originally, a motivating factor for the cell phone search.

The Discipline Hearing Officer (DHO) report for Mr. Washington's discipline, Report No. 3466318, states that Mr. Washington will lose 14 days of good time credit and loss of his cell phone for 30 days. (Complaint, Exhibit C.) As a result of losing his good time credit, Mr. Washington's earliest possible home confinement date has

been delayed from March 19, 2021 to April 2, 2021. His release date has also been delayed, from May 31, 2021 to June 13, 2021. (Complaint, ¶ 52.)

Out of all the prisoners whose cell phones were searched, Mr. Washington was the only resident found to have allegedly committed Prohibited Act 297, "Phone Abuse". (Complaint, ¶ 56.)

The Unit Discipline Committee (UDC) report was provided to Mr. Washington on January 17, 2021. Mr. Washington duly submitted a BP-9 Request for Administrative Remedy on January 21, 2021. (Complaint, ¶ 57.) As of this writing, no response to the BP-9 has been received. *Id.*

As of this writing, BOP lists five active COVID-19 cases at the Taylor Street Center.[4]

## LEGAL ARGUMENT

In determining whether to grant a temporary restraining order, the Court must analyze the following factors: (1) whether the movant has a substantial likelihood of success on the merits; (2) whether irreparable harm will ensue if the request for a TRO is denied; (3) whether the threatened injury outweighs the harm that the TRO may cause the defendants; and (4) whether a TRO is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (addressing the standard for issuance of a preliminary injunction); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F. 3d 832, 839 n.7 (9th Cir. 2001) (noting that the Ninth Circuit treats the standards for a TRO and a preliminary injunction as substantially identical).

"The elements of this test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131 (9th Cir. 2011). "For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on

---

[4]    https://www.bop.gov/coronavirus/

the merits." *Id.* Likewise, serious questions going to the merits, together with a balance of equities that tips sharply in favor of plaintiffs, will support the issuance of an injunction where the other elements are met. *Id.* at 1134-35.

A more stringent standard is applied where mandatory, as opposed to prohibitory, injunctive relief is sought. Although the same principles inform the court's analysis in deciding whether to issue mandatory or prohibitory relief, mandatory preliminary relief should not issue unless both the facts and the law clearly favor the moving party and "extreme or very serious damage" will result that is not "capable of compensation in damages". *Hernandez v. Sessions,* 872 F. 3d 976, 999 (9th Cir. 2017) (citing *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 561 F. 3d 873, 879 (9th Cir. 2009)). A mandatory injunction is most likely to be appropriate when "the status quo . . . is exactly what will inflict the irreparable injury upon complainant." *Id.,* at 999 (citing *Friends for all Children, Inc. v. Lockheed Aircraft Corp.,* 746 F. 2d 816, 830 n.21 (D.C. Cir. 1984)).

## I. Plaintiff, Keith H. Washington, Is Likely to Succeed on the Merits of His Constitutional Claim

The content of Mr. Washington's speech, concerning the COVID outbreak at the Taylor Street Center, was the **sole** motivating factor for the retaliation against him. Such retaliation is arbitrary and capricious. It is "not a reasonable exercise of prison authority and . . . [does] not serve any legitimate correctional goal." *Rizzo v. Dawson*, 778 F. 2d 527, 532 (9th Cir. 1985). Furthermore, the disciplinary sanctions imposed here included an open-ended, blanket requirement for approval on all contact with the press. Such requirements are not narrowly tailored, and cannot reasonably advance any legitimate correctional goal. *Id.* The restrictions imposed on Mr. Washington also serve no legitimate correctional goal because they are completely "unnecessary to the maintenance of order" at the Taylor Street Center – a RRC from which prisoners leave on a daily basis to work in the community. *Franklin v. Murphy,* 745 F. 2d 1221, 1230 (9th Cir. 1984).

Furthermore, under BOP's own inmate discipline policy, capricious and retaliatory sanctions are not permitted. 28 C.F.R. § 541.1. Mr. Washington's incident report, and the belated edits made to it to provide a pretext for the cell phone search, show that his discipline was facially, transparently and solely motivated by the SF Bay View's press release concerning the outbreak, as well as Mr. Redmond's emails to the GEO Group concerning the COVID outbreak at the Taylor Street Center. Sanctions which are plainly retaliatory advance no legitimate correctional goal.

A viable claim of First Amendment retaliation contains five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F. 3d 559 (9th Cir. 2005).

In the Ninth Circuit, the prohibition against retaliatory punishment for First Amendment protected activity is clearly established law, for qualified immunity purposes. *Pratt v. Rowland*, 65 F. 3d 802, 806 (9th Cir. 1995).

## A.   Defendants Took Adverse Action Against Mr. Washington Because of His Protected Conduct, Chilling His Exercise of First Amendment Rights

The First Amendment protects the "right to communicate with persons outside prison walls," and telephone communication is a means of exercising this right. *Valdez v. Rosenbaum,* 302 F. 3d 1039, 1048 (9th Cir. 2002). The First Amendment also "includes a right to communicate a person's view to any willing listener, including a willing representative of the press for the purpose of publication by a willing publisher." *Pell v Procunier,* 417 U.S. 817, 822 (1974). "Unflattering or unwelcome opinions," or even "factually inaccurate statements," are protected conduct and cannot be censored because they "unduly complain" or "magnify grievances". *Procunier v. Martinez*, 416 U.S. 396, 314 (1974).

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 12

Mr. Washington's telephone call to Mr. Redmond on January 8 and 9 was a phone call to a private individual outside the Taylor Street Center expressing Mr. Washington's opinion on the COVID outbreak, and thus protected conduct. Likewise, his texts to Mr. Redmond were protected conduct. Although the telephone call would also have been protected conduct even if it had been an official interview by Mr. Redmond for 48hills, the call was not an interview. It was a private call by Mr. Washington, who is also a member of the press and an employee of the Bay View, acting within the parameters of his BOP-authorized job.

Furthermore, to the extent that Mr. Washington was involved in the publication of the SF Bay View's press release exposing the outbreak, his speech leading to the publication of the press release was also protected conduct.

Following Mr. Washington's phone conversation with Mr. Redmond on January 9, Mr. Redmond sent an email to facility director Maria Richard at 3:58 p.m. The next day, January 10, Vice President for Communications at the GEO Group, Monica Hook, denied the existence of the COVID outbreak to Mr. Redmond in an email at 2:56 p.m. At approximately the same time – slightly more than 24 hours after Mr. Redmond's original email – Ms. Richard revoked Mr. Washington's permission to attend a press conference on January 11, 2021, which had previously been approved by his case manager for being routine. Shortly afterwards, between 4:15 and 4:30 p.m. on January 10, the pretextual cell phone search by defendant Will Gomez took place.

Retaliatory motive can be shown by the timing of the retaliatory act and inconsistency with previous actions, as well as direct evidence. *Bruce v. Ylst*, 351 F. 3d 1283, 1288 (9th Cir. 2003). The cell phone search here took place less than 24 hours after Mr. Redmond's email and the SF Bay View's press release, and while Redmond's exchange with GEO Group Vice President Monica Hook was continuing. There were no cell phone searches of this sort in the facility for at least six months

prior to January 10, 2021. The timing of the retaliatory act and its inconsistency with previous practice thus demonstrates retaliatory motive.

But direct evidence also exists. The Incident Report, written by Will Gomez at 5:00 p.m. on January 10, 2021, explicitly states that Mr. Washington was disciplined for violating Prohibited Act 327 of BOP's Inmate Discipline Program, Program Statement 5270.09, "Unauthorized Contact With the Public." (Complaint, Exhibit B.) The member of the "public" who Mr. Washington had "unauthorized contact" with was a journalist, Mr. Redmond, as the Incident Report explicitly states.

Defendant Gomez states that "Staff became aware of incident" at 4:00 p.m., that a cell phone search took place, and that defendant Gomez located a copy of the January 8 COVID memo, text messages to Mr. Redmond and a link to the public Twitter posting on Mr. Washington's phone. Notably, the incident report *quotes the entirety of Mr. Redmond's original email* to defendant Richard, which was sent at 3:58 p.m. the previous day – 24 hours before the cell phone search took place. (Complaint, Exhibit B.)

Defendant Gomez gives no explanation in his incident report for his sudden inspiration to conduct a cell phone search when no such searches had taken place at the Taylor Street Center for more than six months prior. Nor does defendant Gomez explain in his report why it was that, out of all the residents whose cell phones were searched, Mr. Washington's phone was the only one confiscated, and Mr. Washington the only individual punished.

Gomez's incident report facially demonstrates that the cell phone search was motivated by GEO Group's suspicion that Mr. Washington was responsible for the coverage of the developing COVID outbreak. After Mr. Washington was disciplined, in his meeting with defendant Richard on January 11, 2021, Defendant Richard handwrote on the incident report the additional charge of "phone abuse". This after-the-fact correction confirms, firstly, that Defendant Gomez was not seeking cell phone violations during his original cell phone search. It also demonstrates

Defendant Richard's awareness of the need to create a *post facto* pretext for the discipline which did not involve Mr. Washington's role in exposing of the COVID outbreak at her facility.

Direct evidence, timing and inconsistency with previous practice all show that BOP and the GEO Group retaliated against Mr. Washington for his protected conduct, and that Mr. Washington's exposure of the COVID outbreak was the sole reason for the sanctions imposed on him.

Mr. Washington was subject to a open-ended requirement for BOP approval of all speech with members of the press, along with the confiscation of his cell phone. A litigant need not show a total chilling of his First Amendment rights in order to make out a retaliation claim. *Rhodes v. Robinson*, 408 F. 3d 559, 568 (9th Cir. 2005). In this case, Mr. Washington's speech has not been chilled; it has been silenced. The reach of BOP's restrictions on speaking with members of the press extends to personal friends, such as Mr. Redmond, who also happen to be members of the press. Professional contacts of Mr. Washington have not contacted him because they fear he will be retaliated against. (Declaration of Alexis Terrazas, ¶ 12-15, Declaration of Steve Zeltzer, ¶ 11-14.)  Collaborations between the SF Bay View and other news organizations have also been harmed by these restrictions. (Declaration of Alexis Terrazas, ¶ 14-15.)

Furthermore, the press restrictions inhibit Mr. Washington in his ability to function as editor of the SF Bay View. As such, it interferes with newsgathering, which is protected First Amendment activity. *Branzburg v. Hayes,* 408 U.S. 665, 682 (1972). To the extent that Mr. Washington's speech with members of the press concerns matters of public concern, such as the COVID outbreak, the First Amendment interest implicated by BOP and GEO Group's retaliation here is of "overriding importance". *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001) (collecting cases).

### B.    No Legitimate Correctional Purpose is Served By the Action

Retaliation is "not a reasonable exercise of prison authority and . . . [does] not serve any legitimate correctional goal." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). A plaintiff demonstrates that retaliatory action does not advance legitimate correctional goals if he shows that the actions taken were arbitrary and capricious. *Id*. Disciplinary action which was taken solely for a retaliatory purpose serves no legitimate correctional goal. *Pratt v. Rowland*, 65 F. 3d 802, 807 (9th Cir. 1995).

Although the prisoner bears the burden of pleading and proving the absence of legitimate correctional goals, *Pratt,* 65 F. 3d at 806, prisons cannot establish a legitimate correctional goal by "articulating a general justification for a neutral process" if the prisoner shows that the disciplinary process was used "as a cover or a ruse" to punish him. *Bruce v. Ylst*, 351 F. 3d 1283, 1289 (9th Cir. 2003). This is so *even if*, under the disciplinary system, the prisoner arguably could have been legitimately punished for his conduct absent the retaliatory motive. *Id*. (citing *Rizzo, supra,* 778 F. 2d at 532.)

Actions which are "unnecessary to the maintenance of order in the institution" serve no legitimate correctional goal.  *Watison v. Carter*, 668 F. 3d 1108, 1114-15 (9th Cir. 2012) (citing *Rizzo v. Dawson,* 778 F. 2d 527, 532 (9th Cir. 1985), *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984)). Furthermore, disciplinary action must be narrowly tailored to meet the goal in question. *Rizzo v. Dawson*, 778 F. 2d 527, 532 (9th Cir. 1985).

The disciplinary action here included a open-ended requirement for BOP review of all Mr. Washington's contacts with the press, covering all conversations, interviews, and collaboration, regardless of whether or not the topic of the conversation covered BOP, GEO Group or the COVID outbreak at the Taylor Street Center. Several of Mr. Washington's colleagues in the press have refrained from contacting him because of the press restrictions. (Declaration of Alex Terrazas, ¶ 13-15; Declaration of Steve Zeltzer, ¶ 11-14.) They have ceased working with him on

stories; they have refrained from contacting him; and a joint project to create a partnership between the SF Bay View and El Tecolote, a local Spanish/English bilingual newspaper, has fallen apart because Mr. Washington can no longer participate in meetings. *Id.*

These restrictions are not narrowly tailored. They contain no restrictions or clarification on the types of contact which will or will not be permitted, and they are not constrained to particular topics. Such a restriction cannot serve any asserted correctional goal.

Although institutional security is a legitimate correctional goal, *Morrison v. Hall,* 261 F. 3d 896, 907 (9th Cir. 2001), security at the Taylor Street Center is not served by disciplining speech to outside persons who then proceed to send press inquiries to facility staff. Outgoing communications, such as Mr. Washington's phone call, do not implicate security concerns inside a prison. *Thornburgh v. Abbott*, 490 U.S. 410, 411-12 (1989) (citing *Procunier v. Martinez*, 416 U.S. 396, 414-16 (1974).) If anything, publicity and news coverage of the COVID outbreak at the Taylor Street Center increases, rather than decreases, institutional security since it incentivizes facility staff to report cases and take precautionary measures to prevent further transmission, whereas denying the outbreak, as Defendant Hook did, increases the likelihood of serious harm to staff and prisoners.

As previously argued, the sole reason for the retaliation against Mr. Washington was his protected speech concerning the COVID outbreak at the Taylor Street Center. Such action is arbitrary and capricious. It does not meet the Bureau of Prisons' own standard for inmate discipline. 28 C.F.R. § 541.1 ("Sanctions will not be imposed in a capricious or arbitrary manner.") Such retaliation serves no legitimate correctional purpose, even if BOP or GEO Group advance a neutral justification for the disciplinary rule, or show that Mr. Washington actually violated the rule in question. *Bruce v. Ylst*, *supra,* 351 F. 3d at 1289.

## II.   Plaintiff, SF Bay View, is Likely to Succeed on the Merits of Its Constitutional Claim

Outside the prison context, a plaintiff alleging First Amendment retaliation must show that (1) they engaged in a constitutionally protected activity; (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in Defendants' conduct. *Sampson v. Cty. of Los Angeles*, 974 F. 3d 1012, 1019 (9th Cir. 2020) (citing *O'Brien v. Welty,* 818 F. 3d 920, 932 (9th Cir. 2016)).

### A.   The SF Bay View Engaged in Constitutionally Protected Activity

As a corporation, the SF Bay View's speech is entitled to First Amendment protection. *Citizens United v. Federal Election Com'n,* 558 U.S. 310, 341 (2010) (collecting cases). The SF Bay View is also a newspaper, and its speech is entitled to First Amendment protection on that basis as well. *Grosjean v. American Press Co.,* 297 U.S. 233, 250 (1936). When the editor of a newspaper is targeted by a statute, the prosecution implicates "more serious First Amendment overtones." *Bigelow v. Virginia,* 421 U.S. 809 (1975).

Mr. Washington is the editor of the SF Bay View – a job which he was authorized to work in by BOP and the GEO Group. With Mr. Washington as editor, the SF Bay View published a press release concerning the COVID Outbreak. Mr. Washington also communicates and collaborates with other reporters, such as Mr. Redmond, on news stories.

The press release is speech by the SF Bay View. Likewise, Mr. Washington's phone conversation and communcations with Mr. Redmond, made in furtherance of his work responsibilities, is journalistic and editorial speech on behalf of, and by, the SF Bay View.

### B.   The Activity was a Substantial or Motivating Factor in Defendants' Conduct

When showing that the protected activity was a substantial or motivating factor in the retaliation, plaintiff must show that the "retaliatory animus" was a "but for" cause of their injury, "meaning that the adverse action against [them] would not have been taken absent the retaliatory motive." *Nieves v. Bartlett,* 139 S. Ct. 1715, 1722 (2019). The SF Bay View's protected speech was a "but for" cause of the retaliation, since the retaliation was solely motivated by the SF Bay View's press release and Mr. Washington's speech to Mr. Redmond concerning the COVID outbreak.

### C. Defendants' Actions Would Chill a Person of Ordinary Firmness From Continuing to Engage in the Protected Activity

A litigant need not show a total chilling of his First Amendment rights in order to make out a retaliation claim. *Rhodes v. Robinson*, 408 F. 3d 559, 568 (9th Cir. 2005). Mr. Washington's colleagues in the media have refrained from contacting him because of fear that they will subject him to retaliation, and collaboration between the SF Bay View and other news organizations have been put on hold because of the press restrictions. (Declaration of Alexis Terrazas, ¶ 13-15, Declaration of Steve Zeltzer, ¶ 11-14.)  Most significantly, this unjustified and plainly retaliatory action by defendants has damaged morale at the SF Bay View and hampered its operations, delaying the production of the February issue of the newspaper. (Declaration of Mary Ratcliff, ¶ 26-27.)

### III. Plaintiffs Have Been, and Will be, Irreparably Harmed if this Court Does Not Protect their Constitutional Rights by Issuing a Temporary Restraining Order

"The loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Associated Press v. Otter*, 682 F. 3d 821, 826 (9th Cir. 2012) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A "colorable First Amendment claim . . . is irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford,* 418 F. 3d 989, 1001 (9th Cir. 2005). The

Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo,* 944 F. 3d 816, 833 (9th Cir. 2019).

Plaintiffs, Mr. Washington and the SF Bay View, have already suffered irreparable injury as a result of this retaliation. Mr. Washington and the SF Bay View have been unable to report on at least one developing story concerning racism in the City of San Francisco. (Declaration of Steve Zeltzer, ¶ 11-14.) A collaborative project between the SF Bay View and a bilingual English/Spanish newspaper, El Tecolote, has stalled. (Declaration of Alexis Terrazas, ¶ 13-15.) The production of the February issue of the SF Bay View has been delayed because of defendants' actions. (Declaration of Mary Ratcliff, ¶ 19-25.) Most significantly, Plaintiffs are now unable to report on the COVID outbreak at the Taylor Street Center – a developing outbreak and public health issue in the middle of San Francisco. Plaintiffs require immediate relief from this Court to prevent ongoing and future harm to their First Amendment rights.

## IV.  The Balance of Equities Weighs in Plaintiffs' Favor as it is Always in the Public Interest to Protect Constitutional Rights

When the government is a party, the last two factors of the preliminary injunction inquiry – the balancing of equities and the public interest inquiry – merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F. 3d 1073, 1092 (9th Cir. 2014).

When plaintiffs raise "serious First Amendment questions . . . the balance of hardships tips sharply in [the plaintiffs'] favor." *Cmty. House, Inc. v. City of Boise,* 490 F. 3d 1041, 1059 (9th Cir. 2007). Further, "it is always in the public's interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs/Blue Mountains Biodiversity Project v. Connaughton*, 752 F. 3d 655, 766 (9th Cir. 2014).

The public interest implicated here concerns more than a single individual's right to have a private conversation outside prison walls. The people of the Bay Area have a strong, indeed overwhelming, interest in news concerning a COVID outbreak in a building located in the heart of the Tenderloin. The public is entitled to know the basic facts concerning the outbreak, the number of cases, whether the outbreak is spreading, whether staff as well as prisoners are infected, and what preventive measures BOP/GEO Group is taking to prevent further infection. Mere statistics on the BOP's website – the only voluntarily disclosed information to date - do not fill this need.[5]

The public interest is heightened here because, instead of disclosing information about the spread of the outbreak, GEO Group denied that the outbreak was taking place. It retaliated against a journalist and newspaper who provided information about the outbreak, and delayed posting information about the outbreak on the Bureau of Prisons website. These are all matters of intense public concern, particularly when a private prison contractor is involved. *See, e.g., Perez v. Wolf,* 445 F. Supp. 3d 275, 295 (N.D. Cal. 2020) (COVID-19 outbreak) (". . . the public interest in promoting public health is served by efforts to contain the further spread of COVID-19, particularly in detention centers, which are typically staffed by persons who reside in the local communities."); *Cameron v. Bouchard*, 462 F. Supp. 3d 746 (E.D. Mich. 2020) (COVID-19 outbreak); *Valentine v. Collier,* 2020 U.S. Dist. LEXIS 178652 (S.D. Tex. 2020) (same).

Mr. Washington spoke to another journalist, in his capacity as the editor of the largest Black newspaper in the country, about a developing COVID outbreak in the middle of San Francisco. He also participated in publishing news concerning the outbreak. Even GEO Vice President Monica Hook was forced to acknowledge, when

---

[5]   https://www.bop.gov/coronavirus/

questioned, that Mr. Washington had a right to express himself regarding the COVID outbreak at the Taylor Street Facility. (Complaint, ¶ 50.) That promise, unfortunately, was honored only in the breach. If any speech can be said to be in the public interest, the conversations here undoubtedly qualify. Mr. Washington should not be punished for rendering an important service to the people of San Francisco and the Bay Area.

## V.   Exhaustion Under the Prison Litigation Reform Act Does Not Apply

Although exhaustion under the Prison Litigation Reform Act (PLRA) is an affirmative defense which need not be pled by the plaintiff, *Jones v. Bock*, 549 U.S. 199 (2007), for purposes of establishing their entitlement to injunctive relief, plaintiffs establish that PLRA exhaustion does not apply here.

### A.   A Textual Exception to the PLRA's Exhaustion Requirement Applies

Under the Prison Litigation Reform Act (PLRA), a prisoner is required to exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). However, a prisoner "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake,* 136 S.Ct. 1850, 1858 (2016) (Kagan, J.). An prisoner is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of. *Ross,* 136 S. Ct. at 1859 (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)).

In *Ross,* the Supreme Court noted three textually-rooted exceptions to the PLRA's exhaustion requirement. Firstly, if an administrative procedure "operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates", an administrative procedure is unavailable. *Id.* at 1859. Next, if "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it," administrative relief is unavailable. *Id.* Third, if "prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation or intimidation," *id.* at 1860, the administrative procedure is unavailable, and the PLRA poses no bar.

In the context of a developing COVID-19 outbreak at a prison facility, some courts have held "that the irreparable and time-sensitive harm plaintiffs face in light of the virus renders all grievance procedures inherently unavailable". *Maney v. Brown*, 474 F. Supp. 3d 1191, 1205-06 (D. Or. 2020) (collecting cases). Other courts, however, have required that a plaintiff must still exhaust the administrative process unless one of the three *Ross* categories applies. *Maney,* 474 F. Supp. 3d at 1206 (collecting cases).

 One of the *Ross* categories applies here. Relief is not "available" under the PLRA. Mr. Washington submitted a BP-9 Request for Administrative Remedy on January 21, 2021. Under BOP regulations, a response to the BP-9 can take up to 40 days – 20 days plus a possible 20 day extension. 28 C.F.R. § 542.18. The next level of appeal, with a BP-10 form to the Regional Director, takes up to 60 days – 30 days plus a possible 30 day extension. *Id.* The final level of appeal, a BP-11 form to the General Counsel, takes up to 60 days – 40 days plus a possible 20 day extension. *Id.*

Thus, assuming Mr. Washington files his appeals on the same day he receives a denial, appeal of his discipline will take a minimum of 90 days, and a maximum of 160 days if BOP exercises all its discretionary extensions. This means that the *earliest possible date* for Mr. Washington's appeal to be resolved by the final level of review, even if he responds instantaneously to every denial, is April 21, 2021. If every extension is taken by BOP, the appeal would reach the final level of review on June 30, 2021 – a month after his original expected release date of May 31, 2021, before his good time credits were revoked as a result of the retaliation against him.

In a recent concurrence in the Supreme Court's denial of a plaintiff's application to vacate a stay of a preliminary injunction, Justice Sotomayor, joined by Justice Ginsburg, reasoned that district courts could find grievance procedures unavailable under the "dead end" exception to PLRA exhaustion where "a plaintiff

has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like COVID-19 . . . much in the way they would be if prison officials ignored the grievance entirely." *Valentine v. Collier*, 140 S. Ct. 1598, 1600-01 (May 14, 2020).

In a later dissent during the same litigation, Justice Sotomayor, joined by Justice Kagan – the author of *Ross* – asserted, in the context of an ongoing COVID-19 outbreak at a prison, that a 160 day long grievance process offered "no realistic prospect of relief", and that the PLRA's textual exceptions to exhaustion applied because relief was not "available". *Valentine v. Collier*, 208 L. Ed. 2d 415, 418 (Nov. 16, 2020).

The maximum length of BOP's grievance procedure is, like in *Valentine,* 160 days.

Mr. Washington's First Amendment rights are injured right now. The impairment to the public interest in reporting on an ongoing COVID outbreak cannot wait a week, never mind 90 or 160 days. Regardless, a 160-day appeal would take longer than Mr. Washington's release date of May 31, 2021, which has been pushed back 14 days to June 14, 2021 because of the revocation of his good time credits. Requiring Mr. Washington to exhaust his administrative remedies in this situation could result in an adjudication of his claim after he has already been released. Under these circumstances, relief is unavailable under the PLRA. *See also Sowell v. TDCJ*, 2020 U.S. Dist. LEXIS 77809 (S.D. Tex. 2020) (COVID-19 outbreak) ("Where the circumstances present an imminent danger to an inmate, TDCJ's time-consuming administrative procedure, which TDCJ may choose to extend at will, presents no 'possibility of some relief'").

**B.     PLRA Exhaustion Does Not Apply to the SF Bay View**

The PLRA states that "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison or other correctional facility

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 24

until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The SF Bay View is not a "prisoner confined in any jail, prison or other correctional facility". Therefore, its First Amendment claims, and all its other claims under federal law, are not subject to the exhaustion requirement of the PLRA.

## CONCLUSION

As the Editor-in-Chief of a major national Black newspaper, Mr. Washington is unquestionably entitled both to speak with other journalists, and to report, in his own right, for the SF Bay View, particularly regarding an ongoing COVID-19 outbreak in the very facility where he resides. The retaliation against him was unjustified, and it should be enjoined.

Plaintiffs respectfully request that this Court grant its application for a temporary restraining order and/or an order to show cause, and, following a hearing, issue a preliminary injunction.

Dated: February 1 , 2021          **LAW OFFICES OF RICHARD TAN**

By: _____
          Richard Tan

Attorney for Plaintiffs
KEITH H. WASHINGTON and SAN
FRANCISCO BAY VIEW NATIONAL BLACK
NEWSPAPER

*Washington v. Federal Bureau of Prisons,* Case No.
Memorandum of Points and Authorities for Injunctive Relief - 25