1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2  SARA WINSLOW (DCBN 457643)
   Chief, Civil Division
3  CHRISTOPHER F. JEU (CABN 247865)
   Assistant United States Attorney
4  150 Almaden Boulevard, Suite 900
   San Jose, California 95113
5  Telephone: (408) 535-5082
   FAX: (408) 535-5066
6  Christopher.Jeu@usdoj.gov

7  Attorneys for Defendant
   Federal Bureau of Prisons
8
                    UNITED STATES DISTRICT COURT
9
                   NORTHERN DISTRICT OF CALIFORNIA
10
                          OAKLAND DIVISION
11

12  KEITH H. ("MALIK") WASHINGTON, an          )  Case No. 4:21-cv-00787-JST
    individual; and SAN FRANCISCO BAY          )
13  VIEW NATIONAL BLACK NEWSPAPER,             )  DEFENDANTS' RESPONSE TO PLAINTIFFS'
    a California corporation,                   )  APPLICATIONS FOR TEMPORARY
14                                              )  RESTRAINING ORDER, PRELIMINARY
                                                )  INJUNCTION, AND ORDER TO SHOW CAUSE
15           Plaintiffs,                        )
                                                )
16       v.                                     )  (DKT. NOS. 1, 7, 26, AND 27)
                                                )
17  FEDERAL BUREAU OF PRISONS,                  )  Hon. Jon S. Tigar
    THE GEO GROUP, INC., dba                    )  Location:  Courtroom 6 – 2nd Floor
18  GEO CALIFORNIA, INC., MONICA HOOK,          )  Date:   March 10, 2021
    MARIA RICHARD, WILL GOMEZ,                  )  Time:   9:30 a.m.
19  MURTALA LANVAL, AND DOES 1 through          )
    10, inclusive,                              )
20                                              )
                                                )
21           Defendants.                        )
    _____ )

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................... iii

I.      INTRODUCTION .................................................................................................................1

II.     BACKGROUND ...................................................................................................................3

        A.      Bureau of Prisons Policies. .....................................................................................3

                1.      BOP Prohibited Acts. ....................................................................................3

                2.      BOP's media rules. .......................................................................................4

                3.      BOP/RRC disciplinary proceedings .............................................................5

                4.      Appeal through the Administrative Remedy Program....................................6

        B.      While at the Taylor Street Center, Mr. Washington Violated BOP Policies. .........6

                1.      As a federal inmate, Mr. Washington is subject to BOP and Geo Group
                        rules...............................................................................................................6

                2.      In November 2020, Mr. Washington attends a protest
                        without permission.........................................................................................7

                3.      On January 8, 2021, the BOP does not let Mr. Washington attend a
                        press conference, because Plaintiffs did not provide sufficient
                        advance notice................................................................................................7

                4.      In January 2021, Washington interviews with 48hills.org
                        without permission.........................................................................................8

                5.      In mid-January 2021, Defendants discipline Mr. Washington. .....................8

                6.      Mr. Washington engages in more unauthorized media contact.......................9

                7.      In early February 2021, Plaintiffs file a judicial lawsuit. ...........................10

III.    LEGAL STANDARD...........................................................................................................11

IV.     ARGUMENT .......................................................................................................................12

        A.      Mr. Washington Failed to Exhaust Administrative Remedies..............................12

        B.      Mr. Washington is Unlikely to Prevail on the Merits of his First
                Amendment Claim. ...............................................................................................15

                1.      Inmates' First Amendment rights may be validly restricted........................15

                2.      Washington's First Amendment retaliation claim is
                        fundamentally flawed...................................................................................17

(i)    Defendants did not impose discipline "because of" protected activity.......................................................18

(ii)    Defendants' disciplinary steps serve legitimate penological goals. ..........................................20

(i)    The factual record supports the disciplinary measures. ...........................21

(i)    Defendants' conduct has been appropriately tailored. ...............................22

C.    SF Bay View is Unlikely to Prevail on the Merits of the Retaliation Claim. ...................22

1.    BOP's conduct would not chill the speech of a person of ordinary firmness. ........................................22

2.    SF Bay View's reporting did not have a causal nexus with BOP's discipline. ...............................23

3.    Even if Plaintiff set forth a *prima facie* case, Defendants have rebutted it. ............................................23

D.    Plaintiffs Cannot Meet Their Burden to Show Irreparable Harm. .....................23

E.    The Equities and Public Interest Do Not Favor Plaintiffs. ..........................24

F.    Plaintiffs are Not Entitled to a Mandatory Injunction. ........................24

V.    CONCLUSION...................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Am. Freedom Def. Initiative v. King Cty.*,
  796 F.3d 1165 (9th Cir. 2015) ............................................................................ 24, 25
*Anderson v. United States*,
  612 F.2d 1112 (9th Cir. 1979) ............................................................................ 11, 12
*Assoc. Gen. Contractors of Cal., Inc. v. Coal for Econ. Equity*,
  950 F.2d 1401 (9th Cir.1991) ................................................................................... 24
*Barnett v. Centoni*,
  31 F.3d 813 (9th Cir. 1994) ...................................................................... 18, 20, 21
*Beard v. Banks*,
  548 U.S. 521 (2006) ................................................................................................. 16
*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
  403 U.S. 388 (1971) ................................................................................................. 10
*Blair v. Bethel Sch. Dist.*,
  608 F.3d 540 (9th Cir. 2010) ................................................................................... 22
*Booth v. Churner*,
  532 U.S. 731 (2001) ........................................................................................... 13, 15
*Chiang v. Lappin*,
  No. 07-cv-1017, 2008 WL 2945434 (D. Md. July 24, 2008) ................................... 17
*Coal. for Econ. Equity v. Wilson*,
  122 F.3d 718 (9th Cir. 1997) ................................................................................... 24
*Disney Enters. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ................................................................................... 11
*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ................................................................................... 11
*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...................................................................... 11, 12, 25
*Goldie's Bookstore, Inc. v. Superior Court of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ............................................................................ 23, 24
*Hatch v. Lappin*,
  660 F. Supp. 2d 104 (D. Mass. 2009) ..................................................................... 17
*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) .......................................................................................... 16, 17, 23
*Jones v. Bock*,
  549 U.S. 199 (2007) ................................................................................................. 13
*Jones v. North Carolina Prisoners' Labor Union, Inc.*,
  433 U.S. 119 (1977) ...................................................................................... 16, 20, 21
*Jordan v. Wiley*,
  411 F. Appx. 201, 2011 WL 441776 (10th Cir. 2011) ............................................ 10
*Lira v. Herrera*,
  427 F.3d 1164 (9th Cir. 2005) ................................................................................. 12
*Maney v. Brown*,
  474 F. Supp. 3d 1191 (D. Or. 2020) ................................................................. 13, 14

*Marin All. for Med. Marijuana v. Holder*,
  866 F. Supp. 2d 1142 (N.D. Cal. 2011) ............................................................................ 24
*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir.2009) ............................................................................................ 24
*Martin v. Rison*,
  741 F. Supp. 1406 (N.D. Cal. 1990) ...................................................... 17, 20, 21, 22
*Muhammad v. Close*,
  540 U.S. 749 (2004) ........................................................................................................ 10
*Nettles v. Grounds*,
  830 F.3d 922 (9th Cir. 2016) .......................................................................................... 10
*Newman v. Ponce*,
  No. 18-cv-2348-GW-MAA, 2020 WL 6531233 (C.D. Cal. Sept. 25, 2020) ............ 18, 20, 21
*Newman v. Ponce*,
  No. 18-cv-2348-GW-MAA, 2020 WL 65073221 (C.D. Cal. Nov. 5, 2020)................... 18
*Nieves v. Bartlett*,
  139 S. Ct. 1715 (2019) .................................................................................................... 23
*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................................ 24
*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) .................................................................................... 22, 23
*Pell v. Procunier*,
  417 U.S. 817 (1974) ................................................................................................. 16, 25
*Pierce v. Thomas*,
  No. 08-cv-0641-CL, 2008 WL 2686854 (D. Or. July 8, 2008) ................................... 15
*Porter v. Nussle*,
  534 U.S. 516 (2002) ........................................................................................................ 12
*Rhodes v. Robinson*,
  408 F.3d 559 (9th Cir. 2005) .......................................................................................... 18
*Rizzo v. Dawson*,
  778 F.2d 527 (9th Cir. 1985) .......................................................................................... 21
*Ross v. Blake*,
  136 S. Ct. 1850 (2016)......................................................................................... 12, 13, 14
*Ruviwat v. Smith*,
  701 F.2d 844 (9th Cir. 1983) .................................................................................... 12, 15
*Sampson v. Cty. of Los Angeles*,
  974 F.3d 1012 (9th Cir. 2020) .................................................................................. 22, 23
*Sasso v. Milhollan*,
  735 F. Supp. 1045 (S.D. Fla. 1990) ............................................................................... 24
*Saxbe v. Washington Post Co.*,
  417 U.S. 843 (1974)......................................................................................................... 16
*Seattle-Tacoma Newspaper Guild v. Parker*,
  480 F.2d 1062 (9th Cir. 1973) .................................................................................. 16, 25
*Sierra On-Line, Inc. v. Phx. Software, Inc.*,
  739 F.2d 1415 (9th Cir. 1984) ........................................................................................ 11
*Sowell v. TDCJ*,
  No. 20-cv-1492, 2020 WL 2113603 (S.D. Tex. May 4, 2020)...................................... 14
*Stanley v. Univ. of S. Cal.*,
  13 F.3d 1313 (9th Cir. 1994) .......................................................................................... 11

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009) .................................................................................. 24
*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 .............................................................................................................. 11
*Turner v. Safley*,
   482 U.S. 78 (1987)........................................................................................... 16, 21, 25
*U.S. Philips Corp. v. KBC Bank N.V.*,
   590 F.3d 1091 (9th Cir. 2010) .................................................................................. 11
*Valentine v. Collier*,
   140 S. Ct. 1598................................................................................................................ 14
*Watison v. Carter*,
   668 F.3d 1108 (9th Cir. 2012) .................................................................................. 18
*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982).................................................................................................... 24
*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................... passim
*Wolff v. McDonnell*,
   418 U.S. 539 (1974) .................................................................................................... 18
*Wood v. Beauclair*,
   692 F.3d 1041 (9th Cir. 2012) .................................................................................. 18
*Woodford v. Ngo*,
   548 U.S. 81 (2006) ...................................................................................................... 13
*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017)................................................................................................ 10

Statutes

18 U.S.C. § 3626(g)(2) .......................................................................................................... 12
18 U.S.C. § 4042(a)(3) ............................................................................................................ 3
42 U.S.C. § 1983 .................................................................................................................... 10
42 U.S.C. § 1997e(a).......................................................................................................... 12, 13

Regulations

28 C.F.R. 541.7(a)(4) ............................................................................................................... 5
28 C.F.R. § 540.60 ................................................................................................................... 4
28 C.F.R. § 540.62 ................................................................................................................... 4
28 C.F.R. § 540.62(a).............................................................................................................. 4
28 C.F.R. § 540.62(d)............................................................................................................. 4
28 C.F.R. § 540.62(e)............................................................................................................. 4
28 C.F.R. § 541(a) .................................................................................................................... 5
28 C.F.R. § 541.1 ...................................................................................................................... 3
28 C.F.R. § 541.2 .................................................................................................................. 3, 6
28 C.F.R. § 541.3 ............................................................................................................. 3, 4, 7
28 C.F.R. § 541.3(a) ................................................................................................................ 3
28 C.F.R. § 541.5(a) ................................................................................................................ 5
28 C.F.R. § 541.5(b) ................................................................................................................ 5
28 C.F.R. § 541.5(b)(3)........................................................................................................... 5
28 C.F.R. § 541.7 ...................................................................................................................... 5

28 C.F.R. § 541.7(a) ............................................................................................................. 5
28 C.F.R. § 541.7(c) ............................................................................................................. 5
28 C.F.R. § 541.7(d) ............................................................................................................. 5
28 C.F.R. § 541.7(e) ............................................................................................................. 5
28 C.F.R. § 541.7(f)-(g) ........................................................................................................ 5
28 C.F.R. § 541.7(h) ............................................................................................................. 6
28 C.F.R. § 541.7(i) .............................................................................................................. 6
28 C.F.R. § 541.8 .................................................................................................................. 6
28 C.F.R. § 542.14(d)(2) ................................................................................................. 6, 13
28 C.F.R. § 542.15 ................................................................................................................ 6
28 C.F.R. § 542.15(a) ........................................................................................................... 6
28 C.F.R. § 540.63(b) ........................................................................................................... 4
28 C.F.R. § 542.10-.19 ......................................................................................................... 6

## I.    INTRODUCTION

Co-Plaintiff Keith H. "Malik" Washington ("Plaintiff" or "Mr. Washington"), is an inmate in the custody of the Federal Bureau of Prisons ("BOP") and is housed at the Taylor Street Center, which is a Residential Reentry Center ("RRC") operated by Co-Defendant, GEO Group, Inc ("Geo Group").  As a federal inmate, Mr. Washington is subject to BOP rules and regulations.  In September 2020, upon his transfer to the Taylor Street Center, Mr. Washington agreed to comply with the rules of Geo Group, as it operates the Taylor Street Center.  *See, e.g.,* Declaration of Maria Richard ("Richard Decl.") at ¶¶ 7, 8 and 12, Exs. 3-6.  As a condition of his release to Taylor Street, Washington was required to work.  *See id.* at Ex. 4.  He was authorized to work as a reporter for a local on-line news service and agreed to the limitations on reporting locations.  *See, e.g.*, *id.* at ¶ 6, Exs. 4 and 6.  Despite the agreements, Mr. Washington has repeatedly broken the BOP and Geo Group's rules, including:

- In November 2020, Mr. Washington spoke at a rally at the San Francisco Federal Building, even though he was prohibited to attend any off-site events without prior approval.  *Id*. at ¶¶ 9-11.  In response, Geo Group issued a verbal warning.  *Id*. at ¶ 11.

- In December 2020, Mr. Washington attended a rally and press conference at the UC Hastings campus – again, without permission to leave his work site.  *See id.* at ¶ 36; Dkt. No. 26 at ¶ 69.[1]

- In January 2021, Plaintiff interviewed with Tim Redmond, a journalist with 48hills.org, without prior authorization.  *See* Richard Decl. at ¶¶ 19-20, 23-24; Dkt. No. 26 at ¶¶ 37 and 39.  The Geo Group issued an Incident Report, which is one of the principal subjects of this lawsuit.  Richard Decl. at ¶ 25; Dkt. No. 26 at ¶ 52, Ex. B; Dkt. No. 1 at ¶ 47, Ex. B.

- In February 2021, Mr. Washington attended a press conference and a radio interview without prior authorization.  Richard Decl. at ¶ 33; Dkt. No. 26 at ¶¶ 66, 71-72.  On February 4, 2021, the Geo Group issued an Incident Report, which is awaiting administrative adjudication.  Richard Decl. at ¶¶ 35, 38.

The gravamen of Plaintiffs' lawsuit is that Mr. Washington believes he does not have to follow the BOP and the Geo Group's rules, because he works as a reporter for San Francisco Bay View National Black Newspaper ("SF Bay View").  *See, e.g.*, Dkt. No. 7 at 8; Dkt. No. 26 at Prayer for Relief.  Indeed, Plaintiffs assert that the Court should enjoin the BOP, the Geo Group, and the Geo Group employees from "[e]nforcing *any* restrictions on Mr. Washington's ability to speak with other members

---

[1] In February 2021, Geo Group learned of this incident and issued an Incident Report, which is awaiting adjudication.  *Id*. at ¶¶ 35-36.

1    of the press."   Dkt. No. 7 at 8 (emphasis added).[2]  *See also* Dkt. No. 26 at Prayer for Relief.

2           In the Plaintiffs' TRO briefs, Dkt. Nos. 7 and 27, Plaintiffs contend that Defendants have

3    retaliated against them based on their First Amendment activities.[3]  They assert that "the sole reason for

4    the retaliation against Mr. Washington was his protected speech concerning the COVID outbreak at the

5    Taylor Street Center."  Dkt. No. 7 at 24.  *See also id* at 22. But the reality is that Defendants have just

6    been enforcing the applicable rules in real time – as they have become aware of Mr. Washington's

7    various unauthorized actions.

8           The Court should deny Plaintiffs' Applications for a Temporary Restraining Order, Preliminary

9    Injunction, and Order to Show Cause.  Foremost, Plaintiffs are unlikely to prevail on the merits.  First,

10   Mr. Washington should be required to exhaust his administrative remedies.  Plaintiff's failure to exhaust

11   inhibits BOP's investigatory and factfinding process, thereby reducing the effectiveness of judicial

12   review.  Second, Defendants did not retaliate against Mr. Washington based on his protected First

13   Amendment activity.  Indeed, there were legitimate penological reasons for Defendants' conduct,

14   including the need to preserve the Residential Reentry Center's internal order and discipline.

15          Third, Defendants did not retaliate against Plaintiff SF Bay View based on its protected First

16   Amendment conduct.  SF Bay View's conduct did not have substantial causal nexus with Defendants'

17   disciplinary activities.  In addition, Defendants' disciplinary measures would not deter or chill SF Bay

18   View's reporting, because it can assign other reporters to the assignments.

19          Moreover, even if SF Bay View makes a *prima facie* showing of First Amendment retaliation,

20   Defendants have successfully rebutted the *prima facie* case.  Defendants would have conducted the

21   challenged disciplinary activity any way:  they have been applying the BOP and Geo Group's rules in an

22   even-handed basis, so they need to take measures to address Mr. Washington's infractions.

23          Moreover, Plaintiffs are not entitled to a Temporary Restraining Order or Preliminary Injunction

24   based on the other *Winter* factors.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

25   Plaintiffs have not made a showing of irreparable harm, balance of the equities, and public interest.

26

27           [2] Pagination from the headers of the ECF docket entries.

28           [3] The BOP will be glad to provide briefing on Plaintiffs' Fifth Amendment claims or other First
     Amendment issues if the Court would like such briefing.

1   Last, Plaintiffs have not made the requisite showing for a mandatory injunction.

2   **II.      BACKGROUND**

3       **A.      Bureau of Prisons Policies.**

4           **1.      BOP Prohibited Acts.**

5       The Bureau of Prisons' Inmate Discipline Program "helps ensure the safety, security, and orderly

6   operation of correctional facilities, and the protection of the public," by permitting sanctions on "inmates

7   who commit prohibited acts. 28 C.F.R. § 541.1. *See* 18 U.S.C. § 4042(a)(3). The Inmate Discipline

8   Program "applies to sentenced and unsentenced inmates in Bureau custody," including inmates who are

9   "held in custody by direction of, or under an agreement with, the Bureau of Prisons. 28 C.F.R. § 541.2.

10  Likewise, BOP Statement of Work with Residential Reentry Centers explains that Program Statement

11  5270.09, for Inmate Discipline, applies to RRCs. *See, e.g.,* Statement of Work, Residential Reentry

12  Center, Oct. 2016 ("BOP Statement of Work") at vi;[4] Declaration of Ismael Hernandez ("Hernandez

13  Decl.") at ¶ 12.[5]

14      The Bureau of Prisons has issued a list of "Prohibited Acts," which are categorized according to

15  the severity of conduct. 28 C.F.R. § 541.3(a). *See* Inmate Discipline Program, Program Statement No.

16  5270.09, Table 1. Code Level 100s are deemed the "Greatest" Severity Level, code level 200s as

17  "High", code level 300s as "Moderate," and proceeding to 400 level codes as "Low" Severity Level.

18  The Prohibited Acts Code and disciplinary severity scale is set forth at 28 C.F.R. § 541.3.

19      The Bureau of Prisons' list of prohibited conduct includes:

- Prohibited Act 200: "Escape from a work detail, non-secure institution, or other non-secure confinement, including community confinement, with subsequent voluntary return to Bureau of Prisons custody within four hours."

- Prohibited Act 297: "Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act."

---

[4] Available at https://www.justice.gov/archives/dag/page/file/914021/download (last visited February 16, 2021). A copy of the Statement of Work, dated October 2016, is attached as Exhibit 1 to the Declaration of Christopher F. Jeu ("Jeu Decl.").

[5] Program Statement 5270.09 is attached as Exhibit 6 to the Hernandez Declaration. Program Statements 1480.05 and 7300.09 are attached, respectively, as Exhibits 3 and 7. *See* Hernandez Decl. at ¶¶ 10 and 12.

- Prohibited Act 309:  "Violating a condition of a community program."

- Prohibited Act 315:  "Participating in an unauthorized meeting or gathering."

- Prohibited Act 316:  "Being in an unauthorized area without staff authorization."

- Prohibited Act 327:  "Unauthorized contacts with the public."

28 C.F.R. § 541.3; Program Statement 5270.09 at Table 1.

### 2.      BOP's media rules.

The Bureau of Prisons "recognizes the desirability of establishing a policy that affords the public information about its operations via the news media." 28 C.F.R. § 540.60.  *See* BOP Program Statement 1480.05 (Sept. 21, 2000).  At the same time, the BOP has the "responsibility to protect the privacy and other rights of inmates and members of the staff." 28 C.F.R. § 540.60.  Moreover, the BOP's rule does not intend "to provide publicity for an inmate or special privileges for the news media," but "rather to insure a better informed public."  *Id.*  Accordingly, interviews "must be regulated to insure the orderly and safe operation of the institution."  *Id*.  The BOP identifies Program Statement 1480.05, News Media Contacts, as among the BOP Program Statements that apply to Residential Reentry Centers.  *See, e.g.*, BOP Statement of Work at vi; Hernandez Decl. at ¶ 12, Ex. 7.

BOP's Program Statement 1480.05 and the Code of Federal Regulations set forth various rules regarding media contacts.  For instance, "[i]nterviews by reporters . . . may be permitted only by special arrangement and with approval." 28 C.F.R. § 540.62(e).  *See* BOP Program Statement 1480.05 at 5.  Likewise, an "inmate currently confined in an institution may not be employed or act as a reporter." 28 C.F.R. § 540.62(d).  Moreover, "[a] media representative shall make advance appointments for visits." 28 C.F.R. § 540.62(a).

Pursuant to 28 C.F.R. § 540.62, a visiting representative of the media is required to obtain written permission from an inmate before recording the voice of an inmate participating in authorized programs and activities.  Per 28 C.F.R. §§ 540.63(b) and (c), either an inmate or a representative of the news media may initiate a request for a personal interview at an institution, but such requests shall be made within a reasonable time prior to the personal interview.

The BOP's Statement of Work likewise provides that the Contractor who operates the RRC "will notify" the BOP Residential Reentry Manager ("RRM") "when a request or contact is made by any

1   media representative." *See* BOP Statement of Work at 7.  The BOP Statement of Work further explains

2   that the "requests or contacts may include, but are not limited to, interviews, visits, or impromptu

3   questions." *Id*. at 7.

4           **3.**      **BOP/RRC disciplinary proceedings**

5          Under the Code of Federal Regulations, inmate disciplinary matters usually begin when a staff

6   member witnesses or reasonably believes that an inmate committed a prohibited act.  28 C.F.R.

7   § 541.5(a).  The staff member prepares an incident report and forwards it to appropriate personnel for

8   investigation.  28 C.F.R. § 541.5(b).  In general, the inmate will "ordinarily receive the incident report

9   within 24 hours of staff becoming aware" of the inmate's involvement in the incident.  28 C.F.R.

10  § 541(a).  An investigation is then performed by a staff member, who determines what, if any, charges

11  should be filed against the inmate.  *Id.*  In addition, the incident report may be "informally resolved at

12  any stage of the disciplinary process," except for prohibited acts in the "Greatest and High severity

13  levels, or as otherwise required by law."  28 C.F.R. § 541.5(b)(3).

14         Under the Code of Federal Regulations, if the investigation reveals sufficient evidence to support

15  a charge, and informal resolution is not deemed appropriate or not accomplished, the matter is referred

16  to a disciplinary committee for a hearing.  *See* 28 C.F.R. § 541.7.  This committee, called a Unit

17  Discipline Committee ("UDC"), conducts a hearing, unless the inmate is charged with a Greatest or

18  High severity prohibited act, in which case the matter is automatically referred to a Discipline Hearing

19  Officer ("DHO").  *See* 28 C.F.R. 541.7(a)(4).  In the context of a Residential Reentry Center, the hearing

20  is conducted by the "Center Discipline Committee."  *See* BOP Statement of Work at 84 and 86.  The

21  term "CDC" is synonymous with the BOP's term "Unit Discipline Team [*sic*], (UDC)."  *Id*. at 83.

22         Under the Code of Federal Regulations, the Unit Discipline Committee reviews the Incident

23  Report, and the UDC will make a finding whether or not the alleged offender committed the prohibited

24  acts.  28 C.F.R. § 541.7(a).  Ordinarily, the UDC will review the Incident Report within five work days

25  after its issuance.  28 C.F.R. § 541.7(c).  The inmate is permitted to appear before the UDC during its

26  review of the Incident Report.  28 C.F.R. § 541.7(d).  In addition, the inmate is permitted to make a

27  statement and present evidence on his behalf.  28 C.F.R. § 541.7(e).  The UDC can impose various

28  sanctions, and it can refer the Incident Report to the DHO for further review.  28 C.F.R. § 541.7(f)-(g);

1   28 C.F.R. § 541.8.  The inmate receives a written copy of the UDC's decision.  28 C.F.R. § 541.7(h).

2   The inmate may appeal the decision through the Administrative Remedy Program.  28 C.F.R. § 541.7(i);

3   28 C.F.R. § 542.15.

4            **4.      Appeal through the Administrative Remedy Program.**

5            The Bureau of Prisons has a formal administrative remedy process.  *See* 28 C.F.R. §§ 542.10-.19.

6   After the Discipline Hearing Officer imposes discipline, the inmate has the right to appeal under the

7   Administrative Remedy Program on the appropriate form ("BP-10") within 20 days to the Regional

8   Director.  *See* 28 C.F.R. § 542.15(a); Hernandez Decl. at ¶ 6; Richard Decl. at ¶¶ 26, 28, and Ex. 13.

9   Appeals of a decision by the DHO proceed immediately to the Regional Director and Central Office.

10  *See* 28 C.F.R. § 542.14(d)(2).

11           If unsatisfied with the Regional Director's response, the inmate may file a Central Office appeal

12  ("BP-11") to the General Counsel within 30 days.  28 C.F.R. § 542.15(a).  When the inmate

13  demonstrates a valid reason, the time periods may be extended.  *Id.*  After receiving the Administrator's

14  response, the inmate has exhausted the BOP's Administrative Remedy Program.

15       **B.     While at the Taylor Street Center, Mr. Washington Violated BOP Policies.**

16            **1.      As a federal inmate, Mr. Washington is subject to BOP and Geo Group rules.**

17           In September 2020, Mr. Washington, who had been convicted of a supervised release violation

18  concerning bank robbery, was transferred by the BOP to the Taylor Street Center, which is a federal

19  RRC.  Richard Decl. ¶¶ 2, 4-5, Ex. 1; Dkt. No. 26 at ¶ 13.  As a federal inmate, Mr. Washington is

20  subject to BOP rules and regulations, including the BOP's Inmate Discipline Program.  *See, e.g.*, 28

21  C.F.R. § 541.2; Hernandez Decl. at ¶¶ 11, 12.  Moreover, upon transfer to the Taylor Street Center, Mr.

22
23  Washington agreed to its rules, including:

24  •   Geo Group's Program Rules and Regulations,  including the "Accountability" requirements,
        which explain that "Personal Accountability is expected at all times" and that "You [m]ust
25      [h]ave [p]ermission to go to every location.  Failure to have permission will result in an incident
        report."  Richard Decl. ¶ 12, Ex. 6.  The Program Rules and Regulations further explain, the
26      "[f]ailure to return on time can result in an incident report for escape."  Richard Decl. ¶ 12, Ex. 6
        (emphasis omitted).
27
28  •   Geo Group's Cell Phone/Computer Policy, which explained that "having a cell phone" is a
        "Privilege – not a Right."  The policy expressly prohibited "tak[ing] pictures at the facility," and
        it explained that cell phones are subject to search and confiscation.  Richard Decl. ¶ 7, Ex. 3; and

- <u>Employment Agreement</u>, in which Mr. Washington agreed that RRC staff "must be able to contact [him] at all times and must always be aware of [his] location."  Thus, Mr. Washington was required to get permission to leave his office during work hours.  Richard Decl. ¶ 8, Ex. 4.

### 2.    In November 2020, Mr. Washington attends a protest without permission.

On November 14, 2020, Mr. Washington attended an off-site protest without the BOP or the Geo Group's permission.  Richard Decl. at ¶¶ 9-10.  On November 15, 2020, Maria Richard ("Ms. Richard"), the Facility Director for the Taylor Street Center, spoke on the phone with Mr. Washington's supervisor, Mary Ratcliff ("Ms. Ratcliff"), who admitted that Mr. Washington had attended the off-site event.  *Id.* at ¶ 11.  Likewise, Mr. Washington, who was present for the call, admitted that he spoke at the protest.  *Id*. at. ¶¶ 10-11.

Ms. Richard, the Facility Director, reminded Ms. Ratcliff and Mr. Washington that he needed prior approval in order to attend any off-site events.  *Id.* at ¶ 11.  Without prior permission to go off-site, Mr. Washington was "out-of-bounds" and violating BOP and Geo Group rules.  *See id.*  For instance, BOP Prohibited Act Code 200 prohibits "[e]scape from a work detail . . . with subsequent voluntary return to Bureau of Prisons custody within four hours."  28 C.F.R. § 541.3; Program Statement 5270.09 at Table 1.  *See* Richard Decl. at ¶ 11.  Likewise, Code 315 prohibits "Participating in an unauthorized meeting or gathering."  28 C.F.R. § 541.3; Program Statement 5270.09 at Table 1.  *See* Richard Decl. at ¶ 11.  In addition, the Geo Group's Employment Agreement states that the Taylor Street Center staff "must always be aware of [the inmate's] location."  Richard Decl. at ¶ 8, Ex. 4.  Mr. Washington had failed to keep the Taylor Street Center's staff informed of his location when he went off-site to the protest.  *See* Richard Decl. at ¶¶ 10-11.  Under BOP Prohibited Act Code 309, "[v]iolating a condition of a community program" is a "moderate severity level" offense.  28 C.F.R. § 541.3; Program Statement 5270.09 at Table 1.  *See* Richard Decl. at ¶ 7.

During the November 15, 2020 call, Ms. Richard reminded both Mr. Washington and Ms. Ratcliff that Mr. Washington needed permission to speak about the BOP or Geo Group.  *Id*. at ¶¶ 10-11, 13.  Likewise, Mr. Washington needed permission to participate in large rallies or group events.  *Id*.  Mr. Washington agreed to honor the agreements, so he was permitted to continue working on-site at the SF Bay View headquarters.  *Id.* at ¶ 14.

### 3.    On January 8, 2021, the BOP does not let Mr. Washington attend a press conference, because Plaintiffs did not provide sufficient advance notice.

1    On January 8, 2021, at 10:57 a.m., Ms. Ratcliff emailed Taylor Street, requesting permission for

2    Mr. Washington to attend a January 11, 2021 press conference about city health employees.  Richard

3    Decl. at ¶¶ 15, 18, and Ex. 8 at 4; Dkt. No. 7 at 12.  The same day, at 12:29 p.m., Mr. Washington's case

4    manager, Ms. Iruayenama, erroneously provided approval.  Richard Decl. at ¶¶ 16, 18, Ex. 8 at 3.

5    On January 8, at 12:39 p.m. – just ten minutes later – Ms. Richard, the Facility Director, sent an

6    email to Ms. Ratcliff, correcting the case manager's response:  BOP's Residential Re-entry Management

7    Office had summarily denied the request, because there was not enough time to satisfy the approval

8    process ahead of the press conference.  Richard Decl. ¶¶ 16 and 18, Ex. 8 at 2-3.  In general, the BOP

9    needs at week or more to provide permission.  Richard Decl. ¶¶ 17-18, Ex. 8 at 3.  Ms. Richard further

10   explained in the 12:39 p.m. email, "Mr. Washington is not permitted to speak in person, video or in

11   writing to any media with out permission from the BOP."  Richard Decl. ¶¶ 17-18, Ex. 8 at 2.

12          **4.      In January 2021, Washington interviews with 48hills.org without permission.**

13   On January 8, 2021, at 9:45 p.m., Plaintiff texted a San Francisco reporter, Tim Redmond, of

14   48hills.org, about COVID-19 cases at Taylor Street Center.  Dkt. No. 26 at ¶ 37; Dkt. No. 7 at 12.  In

15   addition, the Geo Group's memorandum about COVID-19 cases was posted on Twitter.  Dkt. No. 1 at

16   ¶ 39; Dkt. No. 1 at 45-46; Dkt. No. 7 at 13.  On the morning of January 9, 2021, Mr. Washington spoke

17   on the phone with Mr. Redmond, of 48hills.org, about the COVID-19 cases.  Dkt. No. 7 at 12; Dkt. No.

18   26 at ¶ 39.  During the afternoon of January 9, 2021, SF Bay View, issued a press release about COVID

19   cases at the Taylor Street Center.  *Id*. at ¶ 40.  Mr. Washington did not have authorization for his media

20   activities.  Richard Decl. ¶¶ 20 and 24.

21          **5.      In mid-January 2021, Defendants discipline Mr. Washington.**

22   The Geo Group looked into the unauthorized disclosure of Taylor Street Center's information,

23   and the investigation soon led to Mr. Washington.  On January 10, 2021, Taylor Street Center searched

24   several residents' cell phones.  Richard Decl. at ¶¶ 22-23; *see* Dkt. No. 26 at ¶ 49.  Mr. Washington's

25   phone showed his text messages with Mr. Redmond, as well as a photo of the Taylor Street Center

26   memo regarding COVID-19.  Richard Decl. at ¶ 23; Dkt. No. 1 at 43-46.

27          On January 10, 2021, Taylor Street prepared an Incident Report.  *See* Richard Decl. at ¶ 25, Ex.

28   12.  On January 11, 2021, Mr. Washington received a copy.  *See* Richard Decl. at ¶ 25.  The Incident

Report cited Mr. Washington for his unauthorized contact with the media:  Code "327," or "Unauthorized contact with the public."  Richard Decl. at Ex. 12.  The Incident Report further explained that Mr. Washington had agreed not to take photos at the facility, and that his phone had the picture of the Taylor Street Center memorandum.  *Id.*

On January 11, 2021, Mr. Washington attended a disciplinary hearing before the CDC.  Richard Decl. at ¶¶ 25-26, Exs. 12-13; Dkt. No. 1 at 41-42.  Mr. Washington waived the right to 24-hours notice before the appearance before the CDC.  Dkt. No. 1 at 34, 40.  As for representation, Plaintiff waived the right to a staff representative.  *Id.* at 34.  He also waived the right to call witnesses.  *Id.*  Mr. Washington did not submit written documentation.  *Id*.

In his defense, Mr. Washington "stated he was exercising his right to free speech and to contact media."  Dkt. No. 1 at 41."  In addition, Mr. Washington "stated he knew he couldn't take picture[s] of Geo."  *Id.*  Based on the unauthorized cell phone use, Mr. Washington was charged with a violation of Code 297, for cell phone abuse.  *See* Dkt. No. 1 at 35, 36.

As for sanctions, Mr. Washington lost the use of his cell phone for 30 days, from January 15, 2021 to February 13, 2021.[6]  *See* Dkt. No. 1 at 35.  Likewise, he lost 14 days good time credit.  *Id*.

On January 17, 2021, Mr. Washington received a copy of the Incident Report from Phillips Arinda, the BOP Residential Reentry Manager.  Dkt. No. 1 at 33.  The notice explained that Mr. Washington had the right to file an administrative remedy appeal with the Regional Director.  *Id.*

### 6.    Mr. Washington engages in more unauthorized media contact.

Despite the Geo Group's prior instructions and warning, Mr. Washington has engaged in other unauthorized media contact.

- For instance, in February 2021, Mr. Washington participated in a press conference without permission.  Richard Decl. at ¶ 33.

- In February 2021, Mr. Washington conducted a radio interview without permission.  *Id.*

- In February 2021, the Geo Group learned that in December 2020, Mr. Washington had attended a press conference and rally at UC Hastings without permission.  *Id*. at ¶ 36; Dkt. No. 26 at ¶¶ 69, 81; Dkt. No. 27 at 7; Dkt. No. 28 at ¶ 5.

---

[6] The Geo Group has returned Mr. Washington's cell phone.

On February 3, 2021, the Geo Group authored an Incident Report.  Richard Decl. at ¶¶ 35, 38, Ex. 14; Dkt. No. 26 at 52.  In the Incident Report, Mr. Washington was cited for Code 200, Escape from work detail with voluntary return.  Richard Decl. at ¶ 35; Dkt. No. 26 at 52.  Mr. Washington had left his workplace without permission.  Richard Decl. at ¶ 36; Dkt. No. 26 at 52.  Plaintiff was also cited for Code 315, "Participating in an unauthorized meeting or gathering."  Richard Decl. at ¶ 35; Dkt. No. 26 at 52.  The unauthorized meetings included the press conference, the radio interview, and the UC Hastings press conference and rally.  Richard Decl. at ¶¶ 33 and 36.  In addition, Plaintiff was cited for Code 316, "Being in an unauthorized area without staff authorization."  *Id*. at ¶ 35.  For example, Plaintiff had been at the UC Hastings event without permission.  *Id*. at ¶ 36.

The disciplinary hearing has been postponed during the pendency of this Court's proceedings on Plaintiffs' Applications for a Temporary Restraining Order.  *See id*. at 39.

### 7.    In early February 2021, Plaintiffs file a judicial lawsuit.

On February 1, 2021, Plaintiffs Keith H. Washington and San Francisco Bay View National Black Newspaper filed the present lawsuit.  *See* Dkt. Nos. 1 and 7.  In the Complaint, Plaintiffs allege that the BOP, the Geo Group, and various Geo Group employees violated Plaintiffs' First Amendment and Fifth Amendment rights by disciplining Mr. Washington for violating BOP policy.  *See* Dkt. No. 1 at ¶¶ 61-70.[7]  Plaintiffs assert that this action arises under the Administrative Procedure Act and seek declaratory relief.[8]  *Id*. at ¶ 5.  Plaintiff's Memorandum of Points and Authorities is based on Plaintiffs' First Amendment retaliation claim.  *See* Dkt. No. 7 at 18-31.

On February 5, 2021, Plaintiffs filed an Amended Complaint and a Supplemental Application for

---

[7] Dkt. No. 26 includes paragraph numbering errors.  Defendants are including the paragraph numbers from Dkt. No. 26, as written.

[8] While Plaintiffs invoke the APA and Declaratory Judgment Act, Plaintiffs substantive claims sound in habeas as well as *Bivens*/Section 1983 law.  *Cf. Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *Nettles v. Grounds*, 830 F.3d 922, 927 (9th Cir. 2016) ("'The Supreme Court has recognized that "[f]ederal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus, . . . and a complaint under the Civil Rights Act of 1871 . . . 42 U.S.C. § 1983.'") (citing *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam)."  Solely for the purposes of the present briefing, Defendants assume that Plaintiffs have properly pleaded their constitutional challenges.  *But see Jordan v. Wiley*, 411 F. Appx. 201, 214, 2011 WL 441776 (10th Cir. 2011) (unpublished) ("the Administrative Procedure Act does not apply to disciplinary determinations involving the reduction of good-conduct time.").  Defendants reserve such defenses, including that 1) *Bivens* claims cannot be asserted against the Bureau of Prisons and that 2) Plaintiffs improperly seek to expand the *Bivens* remedy, in view of *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).

1    a Temporary Restraining Order.  Dkt. Nos. 26 and 27.  Likewise, Plaintiffs' supplemental brief is based

2    on the First Amendment retaliation claims.  *See* Dkt. No. 27 at 9-15.

3    **III.    LEGAL STANDARD**

4           The substantive standard for issuing a temporary restraining order is identical to the standard for

5    issuing a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,

6    839 n. 7 (9th Cir. 2001).  An injunction is a matter of equitable discretion and is "an extraordinary

7    remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

8    *Winter*, 555 U.S. at 22.  Preliminary injunctions are "never awarded as of right."  *Id.* at 24.

9           "A plaintiff seeking a preliminary injunction must show that: (1) she is likely to succeed on the

10   merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of

11   equities tips in her favor, and (4) an injunction is in the public interest."  *Garcia v. Google, Inc.*, 786

12   F.3d 733, 740 (9th Cir. 2015) (citing *Winter*, 555 U.S. at 20).  Alternatively, a plaintiff can show that

13   there are "'serious questions going to the merits' and the 'balance of hardships tips sharply towards'

14   [plaintiff], as long as the second and third *Winter* factors are [also] satisfied."  *Disney Enters. v.*

15   *VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). "[P]laintiffs seeking a preliminary injunction face a

16   difficult task in proving that they are entitled to this extraordinary remedy."  *Earth Island Inst. v.*

17   *Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).  Petitioner's burden is aptly described as a "heavy" one. *Id.*

18          The purpose of a preliminary injunction "is to preserve the status quo and the rights of the parties

19   until a final judgment issues in the cause."  *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094

20   (9th Cir. 2010).  A preliminary injunction may not be used to obtain "a preliminary adjudication on the

21   merits," but only to preserve the status quo pending final judgment.  *Sierra On-Line, Inc. v. Phx.*

22   *Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

23          In cases where a plaintiff seeks mandatory injunctive relief—seeking to alter the status quo—

24   "courts should be extremely cautious."  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994).

25   A mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* and is

26   particularly disfavored."  *Id.* at 1320 (internal quotations and alteration omitted). A mandatory

27   injunction "should not be issued unless the facts and law clearly favor the moving party."  *Anderson v.*

28   *United States*, 612 F.2d 1112, 1114 (9th Cir. 1979).  Mandatory injunctions "are not granted unless

1  extreme or very serious damage will result and are not issued in doubtful cases[.]" *Id.* at 1115.  A party

2  seeking a mandatory injunction "must establish that the law and facts *clearly favor* her position, not

3  simply that she is likely to succeed."  *Garcia,* 786 F.3d at 740 (emphasis in original).

4  **IV.    ARGUMENT**

5      **A.    Mr. Washington Failed to Exhaust Administrative Remedies.**

6          The Court should deny Plaintiffs' Motions for injunctive relief, because Plaintiff did not exhaust

7  his administrative remedies.  The Court should require Mr. Washington to pursue his remedies through

8  the Administrative Remedy Program, so that the BOP may apply its expertise before the Court

9  undertakes judicial review.  Notably, Mr. Washington has not even attended a CDC hearing based on the

10  February 2021 Incident Report, so the administrative factfinding has not occurred.

11          The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust his administrative

12  remedies before filing a lawsuit with an Article III court challenging prison conditions.  42 U.S.C.

13  § 1997e(a).  An action "with respect to prison conditions" means "any civil proceeding arising under

14  Federal law with respect to the conditions of confinement or the effects of actions by government

15  officials on the lives of persons confined in prison, but does not include habeas corpus proceedings

16  challenging the fact or duration of confinement in prison."  18 U.S.C. § 3626(g)(2); *see also Porter v.*

17  *Nussle*, 534 U.S. 516, 524-25, 532 (2002) (holding that the PLRA's exhaustion requirement applies to

18  "all inmate suits about prison life"); *Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).

19          The Supreme Court has held that the PLRA's exhaustion requirement is mandatory.  *Porter*, 534

20  U.S. at 525; *Ross*, 136 S. Ct. at 1857-58.  The Ninth Circuit has reasoned that requiring exhaustion of

21  administrative remedies will  "aid judicial review by allowing the appropriate development of a factual

22  record in an expert forum; conserve the court's time," due to the "possibility that the relief applied for

23  may be granted at the administrative level; and allow the administrative agency an opportunity to correct

24  errors occurring in the course of administrative proceedings."  *Ruviwat v. Smith*, 701 F.2d 844, 845 (9th

25  Cir. 1983); *see also Lira v. Herrera*, 427 F.3d 1164, 1170 (9th Cir. 2005) ("no claim may be pursued in

26  court unless the prisoner has given the prison authorities an opportunity to consider providing some

27  relief regarding the facts underlying the grievance.").

28          To exhaust administrative remedies, an inmate must "complete the administrative review process

1  in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting

2  *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). "The level of detail necessary in a grievance to comply with

3  the grievance procedures will vary from system to system and claim to claim, but it is the prison's

4  requirements . . . that define the boundaries of proper exhaustion." *Bock*, 549 U.S. at 218.  An inmate

5  must exhaust available remedies even if they are not "plain, speedy and effective." *Booth v. Churner*,

6  532 U.S. 731, 739-41 (2001).  But the PLRA includes a "built-in exception," that the "prisoner need not

7  exhaust remedies if they are not 'available.'" *Ross*, 136 S. Ct. at 1855.

8        In this case, Mr. Washington has not exhausted his administrative remedies for the January 2021

9  Incident Report.  He failed to appeal the decision under the Administrative Remedy Program to the

10  Regional Director.  *See* Hernandez Decl. at ¶ 9; Dkt. No. 27 at 16-18.  Nor has he appealed the decision

11  to the BOP's Office of General Counsel.  *See* Hernandez Decl. at ¶ 9.

12        This case is similar to the facts in *Ross v. Blake*, 136 S. Ct. 1850 (2016).  In  *Ross*, a prison

13  inmate's claim against a prison guard for unlawful use of force required exhaustion of administrative

14  remedies, since the language of 42 U.S.C. § 1997e(a) requiring administrative exhaustion was

15  mandatory, and a pending internal investigation of the guard's conduct did not excuse the inmate from

16  pursuing the prison grievance procedure.  *Id*. at 1856-57 and 1860-61.  Courts are not permitted to craft

17  a "special circumstances" exception to the exhaustion requirement.  *Id*. at 1856.

18        Nonetheless, Plaintiffs assert that Mr. Washington should be excused from exhaustion, arguing

19  that "[r]elief is not 'available under the PLRA."  *See* Dkt. No. 27 at 16; Dkt. No 7 at 30.

20        First, Plaintiffs hypothesize that administrative exhaustion would take too long.  Plaintiffs posit

21  that the "response to the BP-9 can take up to 40 days."  Dkt. No. 7 at 30; Dkt. No. 27 at 16.  Likewise,

22  Plaintiffs posit that the "final level of appeal, a BP-11 form to the General Counsel, takes up to 60 days."

23  Dkt. No. 7 at 30; *see* Dkt. No. 27 at 16.

24        Second, Plaintiffs argue that due to the COVID-19 "virus," "all grievance procedures" are

25  "inherently unavailable."  *See* Dkt. No. 7 at 30 (citing *Maney v. Brown*, 474 F. Supp. 3d 1191, 1205-06

26  (D. Or. 2020).); Dkt. No. 27 at 16 (same).

27        Plaintiffs' "unavailability" arguments are fundamentally flawed.  First, after the DHO has

28  imposed discipline, the inmate's appeal begins at the BP-10 phase.  *See* 28 C.F.R. § 542.14(d)(2).

1   Accordingly, exhaustion requires two steps, not three.  Thus, Plaintiffs' math is incorrect.  Second,

2   Plaintiffs hypothesize that at each stage, the BOP will take the maximum time period.  *See* Dkt. No. 7 at

3   30.  Plaintiffs' argument that the BOP will take too long is based on conjecture.

4        Third, Plaintiffs' reliance on COVID-19 cases is misguided.  In Plaintiffs' cited cases, several

5   courts asserted that exhaustion was not warranted in Eighth Amendment deliberate indifference claims,

6   based on plaintiffs' medical conditions.  *See, e.g., Valentine v. Collier*, 140 S. Ct. 1598, 1599-1600

7   (mem.) (2020) (addressing Eighth Amendment deliberate indifference claim arising from "prison's

8   failure to take basic steps" to protect against COVID-19); *Maney*, 474 F. Supp. 3d at 1205-07 and 1208-

9   09 (alleging deliberate indifference, based on serious health risks from plaintiffs' morbidity risks);

10  *Sowell v. TDCJ*, No. 20-cv-1492, 2020 WL 2113603, at *1-3 (S.D. Tex. May 4, 2020) (deliberate

11  indifference claim arising from failure to test for COVID-19).  In this case, Plaintiff does not assert that

12  Defendants were deliberately indifferent to his medical needs.  Rather, Plaintiffs argue that

13  Mr. Washington should have the right to *report* about COVID-19 without any restrictions.

14       Fourth, Plaintiffs' argument that administrative remedies is a "dead end" is demonstrably false.

15  Dkt. No. 7 at 30; Dkt. No. 27 at 15.  In this case, Ismael Hernandez, the Western Region's Discipline

16  Hearing Administrator, has explained that if presented the January 2021 Incident Report in the

17  Administrative Remedy Program, he would actually *grant* Mr. Hernandez a portion of the relief he has

18  requested.  Hernandez Decl. at ¶ 43.  *See Ross*, 136 S. Ct. at 1859 ("administrative procedure" may be

19  "unavailable" and "operate[] as a simple dead end" where "officers [are] unable or consistently

20  unwilling to provide any relief to aggrieved inmates").

21       In particular, Mr. Hernandez would "direct the reporting officer to rewrite and reserve the

22  incident report on Washington for just a violation of BOP Disciplinary Code 327."  Hernandez Decl. at

23  ¶ 43.  In Mr. Hernandez's experience as Disciplinary Hearing Administrator, Code 297 generally applies

24  to "inmates who circumvent the ability of staff to monitor" phone calls.  *Id*. at ¶ 40.  Accordingly, if Mr.

25  Washington had pursued his administrative remedy, Mr. Hernandez would rewrite the January 2021

26  incident report and cut the Code 297 violation.  *See id*. at ¶¶ 40 and 43.  Thus, Plaintiffs' "dead end"

27  argument fails.  *See Valentine*, 140 S. Ct. at 1600-01 ("grievance procedures" may be a "dead end"

28  where the "prison officials ignored the grievances entirely").

1    In this case, the Administrative Remedy Program is far from a "dead end," and its remedies have

2    been available to address disciplinary issues arising from Mr. Washington's behavior.  *See, e.g., Booth*,

3    532 U.S. at 738.  Indeed, the use of administrative remedies "conserves the court's time," as relief can

4    be "granted at the administrative level."  *Ruviwat*, 701 F.2d at 845.  *See Pierce v. Thomas*, No. 08-cv-

5    0641-CL, 2008 WL 2686854, at *1 (D. Or. July 8, 2008).

6    Plaintiffs' failure to exhaust is even more pronounced as for Mr. Washington's other claims.

7    The Ninth Circuit has reasoned that exhaustion of administrative remedies is warranted, in order to

8    "allow[] the appropriate development of a factual record in an expert forum."  *Ruviwat*, 701 F.2d at 845.

9    As for this second Incident Report, Plaintiff has yet to appear before the Center Discipline

10   Committee.  Instead, Plaintiff filed an Amended Complaint and a Supplemental Application for a TRO.

11   Dkt. Nos. 26 and 27.  The Court should require Plaintiff to exhaust his administrative remedies, which

12   would allow the BOP to develop the factual record and determine whether sanctions are warranted.  *See*

13   *Ruviwat*, 701 F.2d at 845.

14   Plaintiffs' rush to the courthouse has impaired judicial review of Mr. Washington's conduct,

15   such as his attending a "rally" and "press conference" at the UC Hastings Campus without permission.

16   *See* Richard Decl. at ¶ 36, Ex. 14.  Likewise, on February 2, 2021, Mr. Washington conducted a radio

17   interview on KPFA 94.1 without permission.  *Id*. at ¶ 33.  The Court should not permit Mr. Washington

18   to short-circuit the administrative fact-finding process by seeking prematurely judicial relief.

19   **B.      Mr. Washington is Unlikely to Prevail on the Merits of his First Amendment Claim.**

20   The Court should deny Mr. Washington's Motion, because he is unlikely to succeed on the

21   merits of his First Amendment claim.  While Plaintiffs have styled their First Amendment causes of

22   action as retaliation claims, the gravamen of their Complaint is that Defendants do not have the right to

23   regulate Plaintiffs' First Amendment conduct.  *See, e.g*., Dkt. No. 1 at 23 (seeking to prohibit

24   Defendants from "enforcing any and all restrictions on Plaintiff's communicating with journalists,

25   newspapers, online news sites, news media, and members of the public in the course of carrying out his

26   duties as Editor-in-Chief of Plaintiff S.F. Bay View").  Accordingly, Plaintiffs apparently challenge

27   whether the BOP may reasonably regulate an inmate's media contacts.

28   **1.      Inmates' First Amendment rights may be validly restricted.**

DEFS.' RESP. TO PLS.' APPLS. FOR TRO
CASE NO. 4:21-CV-0787-JST                 15

1   The "[l]awful incarceration brings about the necessary withdrawal or limitation of many

2   privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v.*

3   *Procunier*, 417 U.S. 817, 822 (1974) (citations omitted).  In the context of the First Amendment, "a

4   corollary of this principle is that a prison inmate retains those First Amendment rights that are not

5   inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections

6   system." *Id*.  Accordingly, "challenges to prison restrictions that are asserted to inhibit First

7   Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections

8   system, to whose custody and care the prisoner has been committed in accordance with due process of

9   law." *Id.*

10   Thus, the Supreme Court has held that "when a prison regulation impinges on inmates'

11   constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

12   *Turner v. Safley*, 482 U.S. 78, 89 (1987).  The Supreme Court reasoned that this standard is warranted,

13   because "prison administrators," rather than the courts, should "make the difficult judgments concerning

14   institutional operations."  *Id*. at 89 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433

15   U.S. 119, 128 (1977).  In construing such constitutional claims, the "courts owe 'substantial deference to

16   the professional judgment of prison administrators.'"  *Beard v. Banks*, 548 U.S. 521, 528 (2006).

17   With respect to the media's right of access, the Constitution does not "require government to

18   accord the press special access to information not shared by members of the public generally."  *Pell*, 417

19   U.S. at 834.  Thus, journalists do not have the "constitutional right of access to prisons or their inmates

20   beyond that afforded the general public."  *Id.*  "The proposition 'that the Constitution imposes upon

21   government the affirmative duty to make available to journalists sources of information not available to

22   members of the public generally . . . finds no support in the words of the Constitution."  *Saxbe v.*

23   *Washington Post Co.*, 417 U.S. 843, 850 (1974).  *See also Houchins v. KQED, Inc.*, 438 U.S. 1, 14

24   (1978).

25   Pursuant to these general principles, courts have consistently held that inmates do not have a

26   First Amendment right to an in-person interview with media organizations while incarcerated.  *See, e.g.,*

27   *Pell*, 417 U.S. at 822; *Seattle-Tacoma Newspaper Guild v. Parker*, 480 F.2d 1062, 1066 (9th Cir. 1973)

28   ("We find that the interview ban is reasonable action within the scope of the wide discretion of the

1   prison administrators and that it does not violate the prisoners' First Amendment rights."); *Chiang v.*

2   *Lappin*, No. 07-cv-1017, 2008 WL 2945434, at *6-8 (D. Md. July 24, 2008) (rejecting inmate's First

3   Amendment claim under *Pell* and *Turner*, because "he had no constitutional right to an in-person

4   interview while he was incarcerated"). *Cf. Hatch v. Lappin*, 660 F. Supp. 2d 104, 108-11 (D. Mass.

5   2009) (rejecting First Amendment claim arising from Incident Report for "Unauthorized contacts with

6   the public" under Code 327).

7        Applying *Turner* and *Pell*, the Northern District of California has upheld the validity of prison

8   regulations prohibiting an inmate from acting as a newspaper reporter. *Martin v. Rison*, 741 F. Supp.

9   1406, 1413-16 (N.D. Cal. 1990), *vacated as moot sub nom. Chronicle Pub. Co. v. Rison*, 962 F.2d 959

10   (9th Cir. 1992). The institution had a legitimate penological interest in "prison security." *Martin*, 741 F.

11   Supp. at 1414. Moreover, the "regulations also serve a legitimate desire not to give undue prominence

12   to a particular prisoner within the prison population," as the regulations fostered the "egalitarian

13   treatment" of the prisoners. *Id*. at 1415. Accordingly, the plaintiff did not have the "right to engage in

14   writing for compensation. It is a privilege, not a constitutional right, and one that the Bureau of Prisons

15   may regulate, even on a selective basis if the objective of the regulation is legitimate." *Id*. at 1420.

16        Moreover, in *Martin v. Rison*, the Northern District of California rejected the constitutional

17   challenged raised by the co-plaintiff newspaper company. The *Martin* court reasoned that the

18   "regulations do not inhibit the content of what is printed by The Chronicle." *Id*. at 1424. Even if the

19   inmate was not a reporter, the Chronicle could still decide which content to print. *Id.*

20        With this backdrop in mind, Defendants turn to Plaintiffs' retaliation claims.

      **2.**    **Washington's First Amendment retaliation claim is fundamentally flawed.**

22        Mr. Washington contends that Defendants retaliated against him by disciplining him because he

23   reported COVID-19 cases to the media. *See* Dkt. No. 7 at 18-19. Plaintiff argues that his reporting

24   COVID-19 cases was the "sole motivating factor" for Defendants' "disciplinary sanctions." *Id*. at 18.

25   Plaintiff further argues that disciplinary measures can serve "no legitimate correctional goal," because

26   he is housed in a Residential Reentry Center. *Id.* Plaintiff's retaliation arguments are without merit.

27        "Within the prison context, a viable claim of First Amendment retaliation entails five basic

28   elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of

1   (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First

2   Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."

3   *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).  *See Wood v. Beauclair*, 692 F.3d 1041, 1051

4   (9th Cir. 2012); *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012); *Newman v. Ponce*, No. 18-cv-

5   2348-GW-MAA, 2020 WL 6531233, at *6 (C.D. Cal. Sept. 25, 2020), *report and recommendation*

6   *adopted*, 2020 WL 65073221 (C.D. Cal. Nov. 5, 2020).  As for "the more specific prison context of an

7   adverse action that takes the form of a disciplinary sanction imposed by a disciplinary body, a prisoner's

8   retaliation claim will fail if, for example, there is 'some evidence' to support the disciplinary sanction

9   and there is a 'legitimate penological purpose.'"  *Newman,* 2020 WL 6531233, at *6 (citing *Barnett v.*

10  *Centoni*, 31 F.3d 813, 816 (9th Cir. 1994) (*per curiam*).)  *Cf. Wolff v. McDonnell*, 418 U.S. 539 (1974).

11          Mr. Washington is unlikely to succeed on the merits of the retaliation claim for multiple reasons.

12                  **(i)     Defendants did not impose discipline "because of" protected activity.**

13          Plaintiffs baldly assert that "the content of Mr. Washington's speech" concerning COVID-19

14  cases at the Taylor Street Center was the "sole motivating factor" for disciplining him.  Dkt. No. 7 at 18.

15  Plaintiff's retaliation claim is deeply flawed.

16          Defendants have disciplined Mr. Washington because he has repeatedly broken the BOP and

17  Geo Group's rules.  *See, e.g.*, Richard Decl. at ¶¶ 9-10 (November 2020:  attending Federal Building

18  protest without permission); *id*. at ¶ 36 (December 2020:  unauthorized attendance of UC Hastings press

19  conference and rally); *id*. at ¶¶ 22-24 (January 2021:  unauthorized phone interview with 48hills.org); *id.*

20  at. ¶ 33 (February 2021:  unauthorized interview on KPFA 94.1).  His employment position as a reporter

21  does not afford him the opportunity to simply dispense with the requirements and policies of his

22  modified confinement.

23          Two incidents strongly demonstrate that Defendants' disciplinary conduct has not taken place

24  "because of" Plaintiffs' First Amendment activities.

25          First, Mr. Washington alleges that Defendants revoked his permission to attend a January 11,

26  2021 press conference because he reported COVID-19 to 48hills.org.  *See* Dkt. No. 7 at 20.  Plaintiffs'

27  "press conference" theory is flatly incorrect.  In particular, Defendants denied Plaintiffs' request on

28  January 8, 2021 -- *before* Mr. Washington contacted 48hills.org about COVID-19 cases.  As for timing:

- January 8, 2021, 10:57 a.m.:  Plaintiff's supervisor Ms. Ratcliff, emails Taylor Street, requesting permission for Mr. Washington to speak at a January 11, 2021 press conference.  Richard Decl. at ¶¶ 15, 18, and Ex. 8 at 4; Dkt. No. 7 at 12.

- January 8, 2021:  12:29 p.m.:  Washington's case manager erroneously provides approval. Richard Decl. at ¶¶ 16, 18, Ex. 8 at 3.

- January 8, 2021, 12:39 p.m.:  Ms. Richard sends an email to Ms. Ratcliff, correcting the RRC's response:  the BOP had denied the request, because there was not enough time to complete the approval process.  Richard Decl. ¶¶ 16 and 18, Ex. 8 at 2-3.

- January 8, 2021, 9:45 p.m.:  Mr. Washington contacts 48hills about COVID.  Dkt. No. 7 at 12.

Plaintiff's "press conference" theory fails, because there was no causal nexus between contacting Mr. Redmond and denying permission to attend the press conference.

Likewise, Defendants' disciplinary steps predated Mr. Washington's reporting of COVID conditions.  On November 14, 2020, Mr. Washington attended a rally at the San Francisco Federal Building without prior permission.  *See* Richard Decl. at ¶¶ 9-10.  On November 15, 2020, the Geo Group learned about Mr. Washington's violation.  *Id.* at ¶ 10.  That day, Ms. Richard spoke with Mr. Washington's supervisor at San Francisco Bay View, instructing them that Mr. Washington was prohibited from attending any off-site work events without prior approval.  *Id.* at ¶ 11.  During the call, Mr. Washington's supervisor, Ms. Ratcliff, admitted that Mr. Washington had attended the November 14, 2020 protest.  *Id*. at ¶ 11.  Likewise, Mr. Washington admitted to attending the protest.  *Id*. at ¶ 10. Thus, Defendants' disciplinary measures pre-date Plaintiff's supposed protected activity.

Indeed, Defendants have been reasonably applying the BOP and Geo Group's rules.  Mr. Washington understood that unauthorized media contact could result in discipline, including the loss of cell phone privileges and the loss of good time credits.  Nonetheless, despite knowing the BOP's requirement that he obtain prior approval before conducting a media interview, Mr. Washington violated the terms of his Agreement, and the conditions of his confinement by participating in unauthorized media interviews.  Thus, Mr. Washington was disciplined, as would be the case with any other BOP inmate who violates BOP rules and regulations. Mr. Washington's status as a reporter is not the issue, as he has been granted various work approvals.  The disciplinary measures were not in contravention of any First Amendment rights that Mr. Washington may have.  Rather, Mr. Washington's discipline was a direct result of his rules violation, his violation of the terms of his Agreement, and his violation of the

1  conditions of confinement.

2             **(ii)**        **Defendants' disciplinary steps serve legitimate penological goals.**

3         Most importantly the Defendants have had legitimate penological reasons for their disciplinary

4  steps.  The Supreme Court and the Ninth Circuit have recognized that the need for discipline and order

5  are legitimate penological goals.  *See, e.g.*, *Jones*, 433 U.S. at 132 (First Amendment rights may "be

6  curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably

7  conclude that such associations, whether through group meetings or otherwise, possess the likelihood of

8  disruption to prison order or stability."); *Barnett*, 31 F. 3d at 815-16 ("legitimate penological goals"

9  include "preserving institutional order and discipline"); *Newman*, 2020 WL 6531233, at *6.

10         As for the January 2021 Incident Report, Defendants disciplined Mr. Washington because he had

11  failed to obtain prior approval before his phone interview with 48hills.org.  *See* Richard Decl. at ¶ 24.

12  The BOP and Geo Group have a legitimate interest in maintaining "discipline and order" at Taylor

13  Street.  *See, e.g.*, Richard Decl. at ¶ 35; Hernandez Decl. at ¶ 47.  Indeed, even Plaintiffs concede that

14  "institutional security is a legitimate correctional goal."  Dkt. No. 7 at 24.

15         Likewise, Plaintiffs' unauthorized media contacts creates the risk of disciplinary problems,

16  where select inmates "obtain notoriety and influence, becoming a celebrity or an influencer amongst the

17  inmate population."  Hernandez Decl. at ¶ 48; *see* Richard Decl. at ¶ 35.  In turn, the inmate can act in a

18  disruptive manner.  Hernandez Decl. at ¶ 48.  Moreover, the inmate can encourage others to be

19  disruptive.  *Id.  See Martin*, 741 F. Supp. at 1415 (warning that media contact can "pose[] problems of

20  disproportionate notoriety and influence").

21         Mr. Washington's failure to get permission to attend off-site events poses an even greater

22  security risks.  In this case, Mr. Washington has attended multiple off-site events without permission,

23  including a rally at the San Francisco Federal Building in November 2020, and a press conference and at

24  the UC Hastings Campus in December 2020.  *See* Richard Decl. at ¶¶ 9-11, 36.

25         The risks of Mr. Washington's prohibited off-site activities are intuitive and clear.  It is

26  disruptive to the Taylor Street Facility for inmates to "fail to disclose" their locations and go "off-site"

27  without accountability.  Richard Decl. at ¶ 36.  While off-site, the inmates can conduct criminal

28  activities, such as obtaining drugs or weapons.  *Id*.  Likewise, the inmates can associate with people who

1    pose a threat to the facility.  *Id.*

2         Nonetheless, Plaintiffs argue that Defendants' "restrictions" are "completely 'unnecessary to the

3    maintenance of order in the institution.'"  *See* Dkt. No 7 at 18, 23.  Plaintiffs turn a blind eye to the clear

4    risks to the order, safety, and discipline of the facility.  Indeed, the Ninth Circuit has reasoned that

5    inmates' First Amendment rights may be curtailed "whenever the institution's officials, in the exercise

6    of their informed discretion, reasonably conclude that such associations . . . possess the likelihood of

7    prison order or stability."  *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (citing *Jones*, 433 U.S. at

8    132).

9         In this case, Mr. Washington has repeatedly violated the BOP and Geo Group's rules and

10   regulations.  Mr. Washington's conduct has been disruptive to the operation of the Taylor Street Center,

11   and Defendants should be permitted to require him to follow the rules.  Defendants restrictions are

12   "reasonably related" to legitimate penological interests.  *Turner*, 482 U.S. at 89.  *See* Hernandez Decl. at

13   ¶¶ 47-48; Richard Decl. at ¶¶ 35-36.

14                      **(i)      The factual record supports the disciplinary measures.**

15        The Court should find that Mr. Washington is unlikely to succeed on the merits, because there is

16   "'some evidence' to support the disciplinary" steps.  *Newman,* 2020 WL 6531233, at *6 (citing *Barnett*,

17   31 F.3d at 816).

18        First, it is undisputed that Mr. Washington contacted Mr. Redmond of 48hills.org without

19   permission.  *See* Dkt. No. 26 at ¶¶ 37 and 39.  Second, Mr. Washington had a photo of the Taylor Street

20   Center's COVID memo on his cell phone.  *See* Dkt. No. 1 at 46.  Accordingly, there was "some

21   evidence" that Plaintiff violated Geo Group's cell phone policy, by taking a photo at the RRC.  Third,

22   Mr. Washington concedes that he spoke at a UC Hastings event in December 2020.  *See* Dkt. No. 27 at

23   7-8.  Plaintiff did not have permission to attend such an event.  *See* Richard Decl. at ¶ 36.  Fourth,

24   Plaintiff admits that he conducted a press conference on February 2, 2021.  *See* Dkt. No. 27 at 8

25   (discussing "Plaintiffs' press conference on February 2, 2021").  He did not have permission for such a

26   press conference.  Richard Decl. at ¶ 33.  Fifth, Plaintiff was interviewed on the radio, KPFA 94.1,

27   without permission.  *Id.*  Defendants have had ample evidence to take disciplinary measures.

28        //

### (i) Defendants' conduct has been appropriately tailored.

Last, Defendants' conduct has been properly tailored. Most significantly, Mr. Washington is permitted to work on-site for SF Bay View. *See* Richard Decl. at ¶ 6. As part of his job, he can interview others without prior permission. Likewise, Mr. Washington may *attend* without prior permission a press conference at his office.

On the other hand, a part of the Taylor Street Center's accountability requirements and the BOP's regulations, Mr. Washington needs prior permission to go off-site. Moreover, in order to comply with the BOP's regulations and media policy, he needs to get written authorization to *be interviewed*. Likewise, he needs permission to *give* a press conference.

### C. SF Bay View is Unlikely to Prevail on the Merits of the Retaliation Claim.

Co-Plaintiff San Francisco Bay View has asserted a separate First Amendment retaliation claim against Defendants. *See, e.g.*, Dkt. No. 26 at ¶¶ 61-66, 70, 74.

In order to establish a First Amendment retaliation claim, Plaintiff must show that "(1) she engaged in a constitutionally protected activity, (2) Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in Defendants' conduct." *Sampson v. Cty. of Los Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020) (citing *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).) *See Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

### 1. BOP's conduct would not chill the speech of a person of ordinary firmness.

While Defendants have taken steps to discipline Mr. Washington, their actions have only indirectly impacted SF Bay View. Defendants' conduct with respect to SF Bay View would not "stifle someone from speaking out." *Blair*, 608 F.3d at 544. Foremost, SF Bay View can continue reporting its stories. *See Martin*, 741 F. Supp. at 1424 (the "regulations do not inhibit the content of what is printed by The Chronicle."). While Defendants' rules place some limits on Mr. Washington's activities, SF Bay View can just assign another reporter to cover the events or stories. Defendants' actions would not "chill a person of ordinary firmness," because SF Bay View can reassign projects and continue reporting the news.

### 2.   SF Bay View's reporting did not have a causal nexus with BOP's discipline.

SF Bay View's *prima facie* case also fails, because Plaintiff cannot establish that its "protected activity was a substantial or motivating factor in Defendants' conduct." *Sampson*, 974 F.3d at 1019.  In order to prevail, the plaintiff "must establish that Defendants' 'retaliatory animus' was the 'but-for' cause of her injury, 'meaning that the adverse action against [her] would not have been taken absent the retaliatory motive.'" *Id*. (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).)

In this case, the Defendants would have taken the disciplinary steps against Mr. Washington even if SF Bay View had not reported about COVID-19 at Taylor Street.  Since at least November 2020, Mr. Washington has repeatedly violated BOP and Geo Group rules.  *See, e.g.,* Richard Decl. at ¶¶ 9-11. For example, on November 14, 2020, Mr. Washington went to an off-site rally at the Federal Building without permission.  *See id*.  In December 2020, Mr. Washington went to an off-site event at the U.C. Hastings campus without permission.  *See id*. at 36; Dkt. No. 26 at ¶¶ 69 and 81.  Third, Mr. Washington conducted a radio interview on KPFA 94.1 without permission.  *See* Richard Decl. at ¶ 33.  Mr. Washington has broken the rules on many occasions, so Defendants would discipline him regardless of SF Bay View's reporting.

### 3.   Even if Plaintiff set forth a *prima facie* case, Defendants have rebutted it.

After Plaintiff has made a prima facie case, the "burden shifts to the government that it 'would have taken the same action even in the absence of the protected conduct." *O'Brien*, 818 F.3d at 933.  As explained, Mr. Washington has refused to comply with the BOP rules.  He has attended multiple off-site events without authorization.  Likewise, he has attended numerous media events without permission. The Defendants would have taken the same disciplinary steps in the "absence" of SF Bay's reporting.

### D.   Plaintiffs Cannot Meet Their Burden to Show Irreparable Harm.

Plaintiffs cannot show that denying injunctive relief would make irreparable harm the likely outcome.  *Winter*, 555 U.S. at 22 ("plaintiffs seeking preliminary relief . . . [must] demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis in original).  "[A] preliminary injunction will not be issued simply to prevent the possibility of some remote future injury."  *Id*. "Speculative injury does not constitute irreparable injury."  *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

Although the Ninth Circuit has recognized that "[a]n alleged constitutional infringement will often alone constitute irreparable harm," *Goldie's Bookstore, Inc.*, 739 F.2d at 472, "such a presumption is inapposite" where Plaintiffs have failed to demonstrate "'a sufficient likelihood of success on the merits of [their] constitutional claims to warrant the grant of a preliminary injunction.'" *Marin All. for Med. Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1160 (N.D. Cal. 2011) (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Coal for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir.1991)).  Here, Plaintiffs' claims are "too tenuous" to support injunctive relief.  *Goldie's Bookstore*, 739 F.2d at 472.

### E.    The Equities and Public Interest Do Not Favor Plaintiffs.

The third and fourth factors, "harm to the opposing party" and the "public interest," merge "when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

An adverse decision here would negatively impact the public interest by jeopardizing "the orderly and efficient administration" of this country's laws. *See Sasso v. Milhollan*, 735 F. Supp. 1045, 1049 (S.D. Fla. 1990); *see Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.").  The public has an interest in the government's enforcement of its laws.  *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("[T]he district court should give due weight to the serious consideration of the public interest in this case that has already been undertaken by the responsible state officials in Washington, who unanimously passed the rules that are the subject of this appeal.").  By contrast, SF Bay View can reassign Mr. Washington's projects if he is unable to get prior permission.  Moreover, Mr. Washington is permitted to work as a reporter on-site.

### F.    Plaintiffs are Not Entitled to a Mandatory Injunction.

Plaintiffs seek to "restrain Defendants from enforcing any and all restrictions on Plaintiff's communicating with journalists, newspapers, online news sites, news media, and members of the public." Dkt. No. 1 at Prayer for Relief.  Thus, Plaintiffs seek to bar enforcement of BOP's media rules.

Under Ninth Circuit law, "[m]andatory injunctions are 'particularly disfavored.'"  *Am. Freedom Def. Initiative v. King Cty.*, 796 F.3d 1165, 1173 (9th Cir. 2015) (citing *Marlyn Nutraceuticals, Inc. v.

*Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir.2009).).  "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Am. Freedom Def. Initiative*, 796 F.3d at 1173.  *See Garcia*, 786 F.3d at 740 (the moving party must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed").

First, "mandatory injunctions" are not issued in "doubtful cases."  Here, Plaintiffs have not the requisite showing on the merits.  As for First Amendment limits regarding inmates, the Supreme Court and Ninth Circuit have held that the government may make reasonable restrictions of inmates' First Amendment rights.  *See, e.g.*, *Pell*, 417 U.S. at 822; *Turner*, 482 U.S. at 89; *Seattle-Tacoma Newspaper Guild*, 480 F.2d at 1066.  Moreover, Defendants have enforced the BOP and Geo Group rules in an even-handed manner.  In addition, Defendants' actions serve legitimate penological goals.

Second, Plaintiffs would not suffer "extreme or very serious damage" without a mandatory injunction.  In *Am. Freedom Defense Initiative v. King County*, the Ninth Circuit denied the mandatory injunction, because the denial "Plaintiffs' speech in only a small way.  They cannot express their message on the sides of Metro's buses while this case is pending."  796 F.3d at 1173.  In the meantime, Plaintiffs could still "display[] the same ad in many alternative fora."  *Id.*

Likewise, in this case, Plaintiffs can exercise their First Amendment rights in alternative ways.  As for Mr. Washington, he can work for SF Bay View while complying with the BOP and Geo Group's rules.  In particular, Mr. Washington can perform his duties as a reporter on-site.   And while he needs the BOP's permission to *be interviewed*, he may *interview others* as part of his job.

As for the permission process, if Mr. Washington wants to work off-site, he needs to get Defendants' prior authorization.  Likewise, if he wants to be interviewed, he needs prior authorization.  Meanwhile, Mr. Washington can work on other projects at the office.

If Mr. Washington does not have permission, then San Francisco Bay View can send another reporter to cover an event or a story.  Defendants' conduct has little impact on SF Bay View's ability to report the news.  Thus, Plaintiffs are not entitled to a mandatory injunction.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs' Applications should be denied.

1    Respectfully submitted,

2

3    DATED:  February 16, 2021                    DAVID L. ANDERSON
                                                   United States Attorney

4                                                  /s/ Christopher F. Jeu

5                                                  Christopher F. Jeu
                                                   Assistant United States Attorney
6                                                  Attorneys for Defendant
                                                   Federal Bureau of Prisons

7

8                                                   /s/ Cheryl Wilke
                                                   Cheryl Wilke
9                                                  LEWIS BRISBOIS

10
                                                   Attorney for Defendants
11                                                 The Geo Group and Monica Hook

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28