RICHARD TAN, SBN 327366
LAW OFFICES OF RICHARD TAN
3020 Bridgeway, Suite 192
Sausalito, CA 94965
Telephone: (510) 345-3246
Facsimile: (415) 532-1310
Email: richardtan@tutanota.com

Attorneys for Plaintiffs,
KEITH H. WASHINGTON,
SAN FRANCISCO BAY VIEW
NATIONAL BLACK NEWSPAPER

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| WASHINGTON, KEITH H. and SAN FRANCISCO BAY VIEW NATIONAL BLACK NEWSPAPER, <br><br> Plaintiffs, <br><br> vs. <br><br> FEDERAL BUREAU OF PRISONS, GEO CALIFORNIA, INC., MONICA HOOK, MARIA RICHARD, WILL GOMEZ and MURTALA LANVAL, <br><br> Defendants. | Case No.: 4:21-cv-00787-JST <br><br> **DECLARATION OF KEITH H. "MALIK" WASHINGTON IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND/OR ORDER TO SHOW CAUSE AND FOR PRELIMINARY INJUNCTION** |

I, Keith H. "Malik" Washington, hereby declare:

1.     I have personal knowledge of the matters stated in this Declaration, and if called and sworn as a witness in this matter, I could and would competently testify thereto.

2.     I am one of the plaintiffs in this action.

3.     I am presently under the custody of Defendant Federal Bureau of Prisons

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 1

and have been on a "work-release" program as part of my "pre-release" status since September 3, 2020. Prior to the events which form the basis of this lawsuit, I was scheduled to be released from custody on May 31, 2021.

4.      I currently reside at the Taylor Street Residential Reentry Center at 111 Taylor Street, San Francisco, California.

5.      I began my position at the San Francisco Bay View National Black Newspaper ("SF Bay View") on or around September 8, 2020, shortly after I was placed in pre-release status at the Taylor Street Center, and have been employed continuously by the SF Bay View since that date.

6.      When I began working at the SF Bay View on or around September 8, 2020, I was an Assistant Editor. I was promoted to the newspaper's Editor-in-Chief on November 21, 2020, and have held that position since then.

7.      The Bureau of Prisons ("BOP") and the GEO Group, Inc. ("GEO") approved my job at the SF Bay View when Mary Ratcliff, the SF Bay View's co-founder, and Facility Director Maria Richard jointly signed an Employment Verification/Notification on September 5, 2020.

8.      The terms of my employment, as I understood them, are defined by the documents I was given, and signed, around this time. They include the confirmation letter sent by the SF Bay View on August 21, 2020, the Taylor Street Center resident handbook, an Employment Agreement, an Employment Verification/Notification,  a Case Management Job Orientation Memorandum Re: Program Rules and Regulations and GEO Group Program Rules and Regulations which I signed, including the policy on Facility Boundaries. The documents were attached as exhibits to Declaration of Maria Richard in support of Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction ("Defendants' Opposition").

9.      On August 21, 2020, before I began working at the SF Bay View, Mary Ratcliff, the newspaper's co-founder and editor, sent a letter to Maria Richard at the

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 2

Taylor Street Center confirming my employment. A true and correct copy of this letter is attached as Exhibit "2" to the Declaration of Maria Richard in support of Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction ("Defendants' Opposition").

10.     The full text of the letter was:

"This is to confirm that we will be providing Keith H. Washington with both employment and housing when he arrives on Sept. 3.

We'll be happy to provide any further information you require and can be reached at editor@sfbayview.com or by calling at (415) 671-0789."

11.     Contrary to the Declaration of Maria Richards, paragraph 6, this letter does not state that I am only authorized to work "on-site at the Bay View News office headquarters on San Francisco," that I, or the SF Bay View, agreed to "perform my job duties at the Bay View News office, but not at other locations," or that I, or the SF Bay View, knew or agreed that I am "not permitted to leave the Bay View News office to report a story, without prior authorization from Taylor Street."

12.     On or about September 3, 2020, I was provided with a copy of the Taylor Street Resident Handbook. A copy of this handbook is attached as Exhibit "4" to Defendants' Opposition.

13.     The handbook contains no statement that working residents must be physically confined to a single building when working. The handbook contains no statement that I was required to work only at the SF Bay View offices.

14.     Pages 4 to 5 of the handbook contain a section on "Resident Accountability". This section states that "It is the responsibility of GEO Reentry Services to be accountable for every resident at all times." But it does not state how accountability is to be maintained. Nor does it contain any limitation on the locations I am physically allowed to be, when I am working.

15.     Page 5 of the handbook, which applies to me, states that "Our contracts require that we notify your employer of your legal status while you are in our facility .

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 3

. .” This section says nothing about the locations I am physically allowed to be when I am working.

16.     I signed GEO's Policy on Facility Boundaries on September 4, 2020. A copy of this policy is attached as Exhibit "16" to Defendants' Opposition, page 11.

17.     The Facility Boundaries policy defines accountability. "Any deviation from my DAR/Schedule is considered unaccountability and disciplinary action will follow."

18.     Some of my Daily Accountability Reports are included as Exhibit "15" to the Declaration of Maria Richard in support of Defendants' Opposition.

19.     The Daily Accountability Reports state that I went to "Work", "SF Bay View", or "Work/SF Bay View" over the period from December 1, 2020 to January 2, 2021. I have never been made aware of a problem with my DARs.

20.     Contrary to the Declaration of Maria Richard, paragraph 16, the Daily Accountability Reports do not say that I was at "work at the Bay View News", if that means only the physical offices of the SF Bay View at 4917 3rd Street. I understood "work" to mean that I would be working as a journalist, reporting on news stories and attending outside events around the SF Bay View offices.

21.     As part of my job, I create weekly schedules of my hours at the Bay View, every week, which I give to Mary Ratcliff to provide to the Taylor Street Center.

22.     Exhibit "A" is a true and correct copy of one such email chain from myself to Mary, containing a sample schedule to be sent to Job Developer Murtala Lanval.

23.     The schedule does not say I am physically limited to working only in the SF Bay View offices.

24.     I do not consider myself to have been "unaccountable" under the Facility Boundaries policy. My DARs and work schedules were regularly and accurately filled out. I understood that my work meant being able to report on events outside the SF

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 4

Bay View offices, interview people outside the SF Bay View offices, and fundraise outside the SF Bay View offices.

25.    I signed an Employment Agreement on September 5, 2020. A true and correct copy of this Employment Agreement is attached as Exhibit "4" to the Declaration of Maria Richard in support of Defendants' Opposition.

26.    The Employment Agreement states that "I understand that while at work, the Residential Re-entry Center staff must be able to contact me at all times and must always be aware of my location."

27.    The Employment Agreement does not specify how Taylor Street Staff "must be able to contact me at all times", not does it specify how Taylor Street Staff "must always be aware of my location."

28.    Contrary to the Declaration of Maria Richards, paragraph 8, the Employment Agreement does not define what my "workplace" is. It does not say that I am required to obtain approval for leaving my "workplace", if "workplace" means the physical offices of the SF Bay View. I did not understand this agreement to mean that I had to contact Taylor Street staff every time I left the SF Bay View offices. I understood my "workplace" to include all the job sites I would regularly go to in the course of my work for the SF Bay View.

29.    On information and belief, Mary Ratcliff, the SF Bay View's co-founder, and Facility Director Maria Richard signed an Employment Verification/Notification on September 5, 2020. A copy of this Verification/Notification is attached as Exhibit "5" to the Declaration of Maria Richard in support of Defendants' Opposition.

30.    The Employment Verification requires that "any behavioral problems or period of unaccountability be immediately reported to [the Taylor Street Center". What "unaccountability" means is not defined in the document.

31.    The Employment Verification states that the Taylor Street Center will verify my employment through both telephonic and on-site visits.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 5

32.     Contrary to the Declaration of Maria Richards, paragraph 8, the Employment Verification does not define what my "workplace" is. It does not define "unaccountability" in terms of me being outside of the SF Bay View offices. It does not say that I am required to obtain approval for leaving my "workplace", if "workplace" means the physical offices of the SF Bay View. I did not understand this agreement to mean that I had to contact Taylor Street staff every time I left the SF Bay View offices. I understood my "workplace" to include all the job sites I would regularly go to in the course of my work for the SF Bay View.

33.     The Employment Verification states that Mary Ratcliff will report periods of unaccountability to the Taylor Street Center, and that Taylor Street Center staff will periodically verify my employment through both telephonic and on-site visits.

34.     On September 4, 2020, I signed a "Case Management Job Orientation Memorandum Re: Program Rules and Regulations". A true and correct copy of this Memorandum is attached as Exhibit "6" to the Declaration of Maria Richard in support of Defendants' Opposition.

35.     The memorandum says:

> "Accountability: Personal Accountability is expected at all times: RRC, community, pass and furlough. All destinations must be verified. Verification must be turned in when you return to facility.
>
> You Must Have Permission to go to every location. Failure to have permission will result in an incident report. Don't deviate from your DAR. Failure to return on time can result in an incident report for escape. If you are unaccountable for 15 minutes after your schedule return time escape process will be initiated and you may be charged with ESCAPE! If you are running late be sure to call the front desk!!"

36.     Contrary to the Declaration of Maria Richards, paragraph 8, the Employment Verification does not define what my "workplace" is. It does not define "unaccountability" in terms of me being outside of the SF Bay View offices. It does not say that I am required to obtain approval for leaving my "workplace", if

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 6

"workplace" means the physical offices of the SF Bay View. I did not understand this agreement to mean that I had to contact Taylor Street staff every time I left the SF Bay View offices. I understood my "workplace" to include all the job sites I would regularly go to in the course of my work for the SF Bay View.

37.     The memorandum says that "destinations" must be verified. It does not define a "destination" as being outside of the SF Bay View offices. As a journalist, I understood my workplace to include all the job sites I would regularly go to in the course of my work for the SF Bay View.

38.     My understanding, when I began employment at the SF Bay View, was that I was permitted to perform the normal range of work expected of a newspaper editor and journalist who had significant fundraising responsibilities. This included regular contact with the public, other journalists, news media and donors, attendance at public events such as fundraisers, attendance at rallies and demonstrations to report on them and to network, and in-person interviews with people outside of the SF Bay View offices.

39.     I expected that I would leave the SF Bay View offices in the regular course of my work as a journalist and editor of the SF Bay View, just like any other working journalist would. If I had been aware of any restriction on my physical location while at work, I would have brought this up to Taylor Street Center staff.

40.     On information and belief, through conversations with Mary Ratcliff, the co-publisher of the SF Bay View, the SF Bay View understood that I was permitted to perform the normal range of work expected of a newspaper editor and journalist who had significant fundraising responsibilities. This included regular contact with the public, other journalists, news media and donors, attendance at public events such as fundraisers, attendance at rallies and demonstrations to report on them and to network, and in-person interviews with people outside of the SF Bay View offices.

41.     On information and belief, the SF Bay View expected that I would leave the SF Bay View offices in the regular course of my work as a journalist and editor of

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 7

the SF Bay View, just like any other journalist could. If the SF Bay View had been aware of any restriction on my physical location while at work, Mary Ratcliff would have brought this up to Taylor Street Center staff.

42.     The first time we became aware of any potential limitation on my attendance on outside events as the Editor-in-Chief of the SF Bay View was in a meeting with Maria Richard on November 23, 2020 at approximately 11:00 a.m.. Contrary to Defendants' Opposition, and the Declaration of Maria Richard, paragraph 10, this meeting did not take place on November 15, 2020 or "on or about November 15, 2020". It took place on November 23, 2020 around 11:00 a.m.

43.     Following the November 23 meeting, Mary Ratcliff sent an email attempting to clarify BOP/GEO's rules for my attendance at outside events. GEO never responded to Mary's email.

44.     My duties as Editor-in-Chief include the following:

45.     First and foremost, my role as Editor-in-Chief includes developing and writing stories and story ideas. A crucial component of this responsibility includes building relationships with other reporters, news editors and organizations in the community. This includes developing story ideas, research and investigation collaboratively with other members of the journalistic community, both in the Bay Area and nationally. This responsibility includes interviews and covering breaking news at locations outside the SF Bay View offices.

46.     My duties as Editor-in-Chief require me to be in regular contact with the public, journalists and news media. These are professional contacts, not restricted to interviews by other press.

47.     My duties as Editor-in-Chief include reaching out to potential donors and advertisers for the SF Bay View, and fundraising for the paper. This includes attending fundraisers organized by the SF Bay View, public events sponsored by the SF Bay View, and networking with other individuals and organizations at outside events, including rallies and demonstrations, who can provide funds for the paper.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 8

48.     My duties as Editor-in-Chief at the SF Bay View include processing and routing, when appropriate, emails which the SF Bay View receives to the appropriate staff person to process. The SF Bay View receives approximately 500 emails a day. The Editor-in-Chief has to read these emails, determine if a response is appropriate, and forward the email to the staff person who can respond or act on the email. I perform this function both at work and after hours, following my return to the Taylor Street Center in the evenings, on my cell phone.

49.     My duties as Editor-in-Chief include managing the social media accounts of the SF Bay View. Prior to the events which form the basis for this lawsuit, I managed the SF Bay View's Instagram account. I would create between 5 – 10 posts a day. I would perform this function at work at and after hours, following my return to the Taylor Street Center in the evenings, on my cell phone.

50.     My hours of work are as follows:

51.     On Monday through Thursday, I leave the Taylor Street Center at 6:30 a.m. every morning to carry out my Editor-in-Chief duties at the SF Bay View offices in the Bayview-Hunters Point District. I am at the SF Bay View from 8:00 a.m. to 5:00 p.m. I then return to the Taylor Street Center at 6:00 p.m., sign in, and sign out again to go to my second job as a Case Manager at Hope House, a subsidiary of the United Council of Human Services. I work at the Hope House from approximately 6:30 p.m. to 12:30 a.m., and return to the Taylor Street Center after that.

52.     On Fridays, I work at the Hope House from 12:00 p.m. to 10:00 p.m., returning to the Taylor Street Center afterwards.

53.     On Saturdays, I work at the SF Bay View from 3:00 p.m. to 11:00 p.m., returning to the Taylor Street Center afterwards.

54.     Prior to the events commencing on January 8, 2020 which form the basis for this lawsuit, I had no disciplinary write-ups, of any sort, from the beginning of my pre-release status in September 3, 2020, until January 10, 2021.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 9

55.     Periodic urinalysis tests are conducted at the Taylor Street Center of all residents. I have had clean urinalysis tests on every occasion a test was conducted, from September 3, 2020 to the present. I do not consume alcohol or drugs.

56.     Starting on January 8, 2020, Defendant Federal Bureau of Prisons ("BOP") and Defendant the GEO Group, Inc. ("GEO") placed a blanket restriction (a requirement for pre-approval) on all my contacts with the press. Prior to that, they placed no restriction on my contacts with the press.

57.     There was no discussion of approving contacts with the press at during my meeting with Maria Richard on November 23, 2020.

58.     The first time I learnt of a "News Interview Authorization Form", or any restrictions on my ability to speak with other members of the press, was on January 11, 2021, during the events which led to this lawsuit.

59.     There was no restriction placed on my attendance at public events outside the SF Bay View offices during the November 23, 2020 meeting. The meeting was only about 15 minutes long. There was a discussion about "accountability", but no specific rule or restriction was imposed on me at the meeting.

60.     The SF Bay View attempted to clarify the scope of my permission to attend and report on events outside the SF Bay View offices in an email to Maria Richard and Murtala Lanval on November 25, 2020. As the Editor-in-Chief of the SF Bay View, I was aware of this email. The Taylor Street Center never replied to our inquiry.

61.     On November 14, 2020, I attended a march and rally entitled "No More Cages" in San Francisco. The rally was directed at ICE detention centers. I attended the rally in my capacity as the Assistant Editor of the SF Bay View.

62.     On information and belief, the rally began at Union Square, went to the Taylor Street Center, and then to the federal building at Mission and 7th Streets.

63.     I attended the rally in front of the federal building, but not the other parts of the event. During the rally, I addressed the crowd and made remarks which

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 10

were critical of the Bureau of Prisons and the GEO Group.

64.    On November 16, 2020, I attended a rally organized by POOR Magazine at UC Hastings, entitled the "Stolen Land/Hoarded Resources Tour Thru the Tenderloin". I attended this event in my capacity as Editor-in-Chief of the SF Bay View.

65.    The rally at UC Hastings was a protest against the settlement between UC Hastings and the City of San Francisco, under which homeless individuals would be relocated by the City of San Francisco from the vicinity of UC Hastings.

66.    The rally at UC Hastings was co-sponsored by the SF Bay View.

67.    To reach the rally, I took the Muni from the SF Bay View offices, getting off around 7th and Market, and then went to UC Hastings en route to returning to the Taylor Street Center. I arrived at UC Hastings at about 3:30 p.m.

68.    I was asked by the organizers of the rally to address the crowd. I spoke for about three minutes. I never discussed the Bureau of Prisons or the GEO Group in my remarks.

69.    As part of my attendance at the rally, I also reported on the event via recorded video on the SF Bay View Instagram page.

70.    I returned to the Taylor Street Facility after the rally at approximately 5:00 p.m.

71.    At the time I spoke at the rally at UC Hastings, I was aware of no restriction on my ability to attend public events, such as press conferences or demonstrations, in my capacity as Editor-in-Chief of the SF Bay View.

72.    A week after the UC Hastings rally, on November 23, 2020, I saw a red flag in my box at the Taylor Street Center. A red flag means "no movement", meaning I could not go to work that day.

73.    At around 11:00 a.m., I was told by Taylor Street Center staff that the Facility Director, Maria Richard, wanted to speak to me. I was escorted to Richard's office.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 11

74.     Maria Richard said that a "No More Cages" rally had taken place on November 14, 2020.

75.     Maria Richard said that Defendant GEO Group hires people who monitor social media for news articles concerning GEO Group and the Bureau of Prisons, and that she had learnt about the rally from one of these people.

76.     Maria Richard asked if I had been at the "No More Cages" rally. I said that I was not present at the protest at Union Square or in front of the Taylor Street Center, but that I was present at the protest in front of the Federal Building, and that I addressed the crowd at the rally in front of the Federal Building.

77.     Maria Richard said that she used to be a doula (a midwife) and had organized programs for incarcerated pregnant women. Because of that, she had sympathy for activists.

78.     Maria Richard then stated, "I can send you to prison because you were unaccountable [at the rally] for over 15 minutes."

79.     Maria Richard stated, "I can write this incident up with the Bureau of Prisons. If I do so, you will go back to prison."

80.     Maria Richard then stated that she did not want to send me back to prison.

81.     Maria Richard asked me if I was working for the SF Bay View when I was at the "No More Cages" rally. I responded that I was.

82.     Maria Richard said, "Give me a reason not to send you back to prison." I told her that I was working at the event on behalf of the SF Bay View.

83.     Maria Richard asked me who she could speak to in order to confirm this. I told her she could speak to Mary Ratcliff, the co-founder of the SF Bay View and my predecessor as editor-in-chief.

84.     Maria Richard called Mary Ratcliff on the phone. I was present for the phone call. Mary confirmed that I was, indeed, working while at the "No More Cages" rally, doing fundraising for the SF Bay View.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 12

85.     Maria Richard hung up. She stated that "You can go back to work." She stated, however, "I will be watching you." She stated "you need to make sure you aren't anywhere you're not supposed to be."

86.     Maria Richard said to me, "Understand – don't talk about the Bureau of Prisons or the GEO Group, and we'll be fine." I responded, "Yes". I then left the meeting.

87.     The discussion at this meeting was very informal. The meeting only lasted about 15 minutes.

88.     Contrary to the Declaration of Maria Richard, paragraph 11, at no point during this meeting did Defendant Richard inform me that I was prohibited from attending off-site work events without prior approval.

89.     Contrary to the Declaration of Maria Richard, paragraph 13, at no point during this meeting did Defendant Richard inform me that I was forbidden from participating in large rallies or group events.

90.     Contrary to the Declaration of Maria Richard, paragraph 13, at no point during the meeting was I informed that I needed to get prior permission to report about the BOP or GEO Group, nor was I told that I needed to get permission to be interviewed about the BOP or GEO Group.

91.     What I was told was that I was not to talk about the BOP or the GEO Group, and that we would be "fine" if I did that.

92.     I was never given a "News Interview Authorization Form" or any BOP policy at the November 23, 2020 meeting. The first time I learned about the "New Interview Authorization Form", or the requirement that I receive authorization when speaking with members of the press, was on January 11, 2021.

93.     Contrary to the Declaration of Maria Richard, paragraph 13, I never claimed that I did not speak about BOP or the GEO Group at the November 14, 2020 "No More Cages" rally.

94.     Upon leaving the meeting on November 23, 2020, my understanding

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 13

was that Maria Richard and I had agreed that I would not speak about GEO Group or the Bureau of Prisons. If I did, I would be "sent back to prison". However, I would be allowed to continue my job as the editor of the SF Bay View.

95.   How GEO would decide where I was and was not "supposed to be", or what was and was not "accountable", was not explained at the meeting. The meeting only lasted 15 minutes.

96.   Two days after the meeting, on November 25, 2020, Mary Ratcliff at the SF Bay View wrote an email to Maria Richard and GEO Group employee Murtala Lanval seeking to clarify my work responsibilities, the extent of BOP/GEO's permission for me to attend and report on outside events such as rallies and press conferences, and what the procedure is to obtain authorization, should BOP/GEO require it, for me to attend such events.

97.   As the current editor of the SF Bay View, I have access to the email account which Mary used to send this email. I also saw this email when it was written.

98.   The SF Bay View never received a response to its November 25 email, whether from Defendant Richard, Defendant Lanval or any other GEO or BOP representative.

99.   Defendant Lanval is the individual who created the incident report of February 4, charging me with escape, participating in an unauthorized meeting or gathering, and unauthorized contacts with the public.

100.   The November 25 email was mistakenly sent to the wrong email address for Defendant Richard.

101.   On information and belief, Murtala Lanval did receive the November 25 email from the SF Bay View.

102.   In the November 25 email, Mary Ratcliff requested permission for me to speak at Mother Brown's Dining Room on November 26. Mother Brown's Dining Room is a Black-run non-profit run by the United Council of Human Services, which

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 14

provides food, case management and housing to hundreds of unhoused people every day. I was scheduled to speak, lead the Thanksgiving attendees in song, and serve food to the Thanksgiving attendees.

103.   Without explanation, I was not permitted to attend the event at Mother Brown's Dining Room on November 26.

104.   At the beginning of every month, when the SF Bay View newspaper is published, I bring about 50-60 copies of the newspaper and leave them in the library/break room of the Taylor Street Center, which used to be the visitation area before the COVID pandemic began.

105.   The SF Bay View newspaper is read by many staff at the Taylor Street Center. I frequently receive compliments from staff about the paper, who ask for copies of the paper and inquire about the next issue. At least eight different staff at the Taylor Street Facility, including the Facility Director, Maria Richard, have complimented me on articles in the newspaper.

106.   The October 2020 issue of the SF Bay View has a front page article, "An Insider Tour of the Hunters Point Community Biomonitoring Program". The article, with my byline, describes a virtual tour of Dr. Ahimsa Porter Sumchai and Dr. Mark Alexander's biomonitoring program, which monitors levels of radionuclides and toxic hard metals such as arsenic in the bodies of Bayview-Hunters Point residents who live within a mile of the Hunters Point Shipyard.

107.   The article contains photographs taken by me at the offices of Dr. Sumchai at 5021 Third Street in the Bayview. The article also states that I attended the virtual tour in person. The photographs in the article depict me standing next to Dr. Sumchai in her office.

108.   The October 2020 issue of the SF Bay View has a front page article, "Gwen Westbrook and Mother Brown's: Combatting Food Insecurity in Bayview Hunters Point". The article, with my byline, is an interview with Gwendolyn Westbrook, the Director of Mother Brown's Dining Room, a Black-run non-profit

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 15

run by the United Council of Human Services, which provides food, case management and housing to hundreds of unhoused people every day. Mother Brown's Dining Room is at 2111 Jennings St. in Bayview-Hunters Point.

109.    A photograph on the front page depicts myself and SF Bay View Managing Editor Nube Brown standing next to Gwendolyn Westbrook. Other photographs, credited as having been taken by me, depict the non-profit's facilities and staff.

110.    A true and correct copy of the October 2020 issue of the SF Bay View is attached as Exhibit "B".

111.    The November 2020 issue of the SF Bay View has a front page article, "Del Seymour and Code Tenderloin: Addressing San Francisco's Homeless Crisis". The article, with my byline, describes my interview of Del Seymour, the founder of the nonprofit "Code Tenderloin" in the Tenderloin district.

112.    The Del Seymour article contains a photograph of me with Del Seymour, taken in the offices of Code Tenderloin. It also states I was at the Code Tenderloin offices.

113.    I interviewed Del Seymour as the Associate Editor of the SF Bay View.

114.    A true and correct copy of the November 2020 issue of the SF Bay View is attached as Exhibit "C".

115.    The December 2020 issue of the SF Bay has a front page article, "Supervisor Shamann Walton Unveils His Community Safety Strategy". The article, with by byline, describes a press conference held by San Francisco District 10 Supervisor, and the current President of San Francisco's Board of Supervisors, Shamann Walton, to address the recent spike in gun violence in the Bayview Hunters Point community.

116.    The Shamann Walton article has three photographs taken at the press conference, which are credited as having been taken by me. One of them depicts me standing next to Shamann Walton. The article also states that I was at the press

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 16

conference.

117.    I covered the Shamann Walton press conference as the Editor-in-Chief of the SF Bay View.

118.    The December 2020 issue of the SF Bay View has a front page article, "Welcome to the Bay View's Fabulously Successful 2020 Fundraiser!"  The article, with my byline, describes a fundraiser organized by the SF Bay View on November 20, 2020.

119.    The fundraiser article states that I was present at the fundraiser at Mendell Plaza, near the intersection of Third and Palou. It also contains a photograph of myself with five other people at the doorway of the African Outlet store at the corner of Third and Quesada Streets.

120.    I attended the fundraiser as the Editor-in-Chief of the SF Bay View.

121.    A true and correct copy of the December 2020 issue of the SF Bay View is attached as Exhibit "D".

122.    The January 2021 issue of the SF Bay View has a front page article, "Uncle Damien in Action!" It contains an interview with Uncle Damien, who was a prisoner incarcerated at the Taylor Street Center.

123.    I interviewed Uncle Damien as the Editor-in-Chief of the SF Bay View.

124.    A true and correct copy of the January 2021 issue of the SF Bay View is attached as Exhibit "E".

125.    In early January, on or about January 6, Maria Richard spoke to me and complimented me on the article about Uncle Damien. I also received a compliment on the Uncle Damien article from an employee called Jason. I do not know Jason's last name.

126.    On information and belief, GEO Group staff at the Taylor Street Facility, including defendants Maria Richard, Will Gomez and Murtala Lanval, read, and were aware of, all the articles described above, along with all the other articles in the SF Bay View newspaper from September 2020 to the present.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 17

127.     On January 8, 2021, I learned of an outbreak of the COVID-19 pandemic at the Taylor Street Residential Reentry Center. I learned of the outbreak from a non-confidential memorandum which was co-authored by Defendant Maria Richard, which was distributed to residents of the Taylor Street Center that day by Taylor Street Center staff.

128.     I did not know, on January 8, 2021, of any restriction on speaking to members of the press, whether for an interview, professional or anything else. On January 8, I had never seen a "News Interview Authorization Form" before.

129.     At 9:45 p.m. on January 8, 2021, I sent a text message to San Francisco journalist Tim Redmond, founder of an independent internet news site, "48 Hills.org," and the past executive editor of the San Francisco Bay Guardian, an alternative newspaper in the Bay Area. The text stated: "COVID outbreak here, Tim." Mr. Redmond texted back: "Whoa, can I call you in am?"

130.     On January 9, 2021, Defendant GEO placed the Taylor Street Residential Reentry Center on lockdown. The common areas of the facility were closed. Residents were confined to their rooms and only permitted to leave their rooms to pick up meals.

131.     On the morning of January 9, 2021, I spoke with Tim Redmond by telephone concerning the pandemic outbreak at the Taylor Street Residential Reentry Center.  I sent him, from my phone, a copy of the memorandum about the COVID outbreak.

132.     On the morning of January 9, 2021, I spoke with Nube Brown, the Managing Editor of the SF Bay View, by telephone, about the developing COVID outbreak. I spoke with her about the need for the SF Bay View to publish a press release about the outbreak.

133.     In the afternoon of January 9, 2021, a copy of the January 8 memorandum of Defendant GEO concerning the outbreak was posted publicly on Twitter. I sent a link to the posting to Mr. Redmond.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 18

134.    In the late afternoon of January 9, 2021, Nube Brown issued the press release for the SF Bay View. The first draft of the press release was written by me. The release stated, in part:

> "GEO GROUP has withheld information about several staff and residents testing positive for COVID-19 at their Reentry facility located at 111 Taylor Street until last night. They have no plans to test the residents until possibly next week."

135.    I sent a copy of the SF Bay View's press release to Tim Redmond.

136.    On information and belief, based on the statements of Tim Redmond in his articles, Maria Richard, upon receiving an email from Tim Redmond, forwarded Redmond's emails to Monica Hook.

137.    On information and belief, based on the statements of Tim Redmond in his articles, Tim Redmond provided the SF Bay View's press release to Defendant Hook on January 9, 2021, sometime after 6:47 p.m., who then forwarded the press release to Taylor Street Center staff.

138.    At approximately 3:00 p.m. on January 10, 2021, less than 24 hours after Tim Redmond's emails, Ini, an employee of Defendant GEO, went to my room at the Taylor Street Residential Reentry Center and showed me a text message from Maria Richard. The text message stated that the permission previously granted me to attend the January 11, 2021 press conference was revoked. I do not know Ini's last name.

139.    I called my case manager, Ms. Iruayenama, on the phone, and asked why the permission was revoked. She stated that she did not know and that it was Maria Richard who had intervened to revoke it.

140.    Between 4:15 p.m. and 4:30 p.m. on January 10, 2021, Will Gomez seized my cell phone and my roommate's cell phone in addition to the cell phones of other residents. Will Gomez demanded that I give him the code to unlock his cell phone, and I provided the code. Within 15 minutes, all of the cell phones other than mine were returned to their owners. Will Gomez then told me that I was now

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 19

prohibited from using other residents' cell phones.

141.   On information and belief, no comparable search and seizure of residents' cell phones had been conducted at the Taylor Street Residential Reentry Center for at least six months prior to this incident.

142.   At 5:00 pm on January 10, 2021, Will Gomez issued an "Incident Report" to me with regard to the cell phone search.

143.   On January 11, 2021, I was ordered confined to my room at the Taylor Street Residential Reentry Center and barred from attending the press conference that day which I had previously been granted permission to attend. At 11:30 a.m., I was escorted to the board room at the facility for a disciplinary meeting with Maria Richard.

144.   At the meeting, Maria Richard told me that my cell phone would be confiscated for 30 days.

145.   Maria Richard then gave me a "News Interview Authorization Form". She told me that I must fill out the form each time I wished to have any contact with a journalist or member of the press, and obtain written permission for such contact from a staff member of the Taylor Street Residential Reentry Center before having any such contact. Maria Richard further clarified that, in order for me to obtain permission to have contact with a journalist or the press, authorization would have to be obtained from Washington, D.C., presumably from some top official of Defendant BOP. Defendant Richard also revoked 14 days of my good time credits. The revocation of my good time credits delays my earliest possible eligibility for home confinement from March 19, 2021 to April 2, 2021, and delays my release date from May 31, 2021 to June 13, 2021.

146.   During the disciplinary meeting, Defendant Richard revised the Incident Report by adding to it, in her handwriting, a violation of Prohibited Act 297 which she described as "Phone abuse."

147.   Maria Richard concluded the disciplinary meeting by telling me that, if I

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 20

had "kept everything quiet" about the COVID-19 outbreak at the Taylor Street Center, I would not have been disciplined.

148.    On information and belief, I was the only resident charged with violation of Prohibited Act 297 ("Phone Abuse") out of all the residents whose phones were the subject of the above alleged search and seizure.

149.    On January 17, 2021, Defendant GEO provided me with a copy of the Unit Discipline Committee report concerning the hereinabove-alleged incident.

150.    On January 21, 2021, I duly submitted a BP-9 "Request for Administrative Remedy" to Defendant GEO. As of this writing, I have not received a response to the BP-9.

151.    On February 12, 2021, I duly submitted a BP-10 "Regional Administrative Remedy Appeal" to the Regional Director for the Western Region of the Federal Bureau of Prisons at 7338 Shoreline Drive, Stockton, CA 95291.

152.     The original complaint in this lawsuit was filed on Monday, February 1, 2021.

153.    On Tuesday, February 2, 2021, a press conference was held announcing the filing of the lawsuit. I was present at the press conference, which was broadcast from the SF Bay View offices on Zoom. I was present for work at the offices of the SF Bay View, attended the press conference, and spoke during the press conference.

154.    The speakers at the press conference were myself, my attorney, Richard Tan, the co-founder of the SF Bay View and my predecessor as editor, Mary Ratcliff, and the managing editor of the SF Bay View and my fiancée, Nube Brown.

155.    At the press conference, I explained that a COVID outbreak had occurred at 111 Taylor Street (the Taylor Street Center) beginning on January 8, that this story concerned the GEO Group, a multi-billion dollar private prison contractor, and that this was a story about race and class.

156.    I stated that I was attempting to continue the legacy of the San Francisco Bay View National Black Newspaper, which had existed for 45 years. I drew a

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 21

contrast between my treatment, in which home confinement had been rejected, and the treatment of wealthy prisoners such as Paul Manafort.

157.    I referred to President Biden's order ending federal contracts with private prisons, and stated that if President Biden wanted racial equity, Biden and Vice President Kamala Harris should get involved.

158.    I noted that 111 Taylor Street was the site of the Compton Cafeteria, the site of the historic Compton Cafeteria riot in August 1966, and that many in the LGBTQ community are upset that this historic site is now the location of a private prison in the middle of San Francisco.

159.    I stated that the First Amendment rights of myself and "this amazing national black newspaper that has been in this community for 45 years" were under attack.

160.    I ended my remarks by stating that this was about freedom of the press and constitutional rights, and called for the removal of the GEO Group from San Francisco.

161.    At no point during this press conference did I mention any employees of BOP or the GEO Group by name. I stated that my attendance at the press conference on January 11, 2021 had been revoked, that my cell phone had been taken away from me, that I had been told that I could not speak to members of the media, and that if I did so, I would be returned to prison. I did not discuss the specifics of any retaliatory acts directed against me as a result of the events beginning on January 8.

162.    On February 4, 2021 at 6:13 p.m., I was given an Incident Report disciplining me, which had been written by Murtala Lanval.

163.    The basis for the retaliatory incident report was Murtala Lanval's "[review of] a news posting and press conference that was posted on line." The recording was apparently of a "recorded press conference and at a rally sometimes in December 2020, at the UC Hasting Campus".

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 22

164.    The Incident Report states that "He [Malik Washington] diod not have permission to leave his work site. He did not have permission to attend a press conference. Washington was informed on 1/13/2021 all press conference's must be approved in advance by BOP. He was also informed any media contact addressing BOP or GEO facility would need permission from BOP Central Office. His employer was provided this information as well. During the 30 minutes press conference Washington mentioned GEO Taylor St. Center, identifying staff by names and referred to BOP on a number of occasions. He did not submit a request to have contact with the media or attend this meeting."

165.    As I explained, the rally at UC Hastings took place on November 16, 2020, not in December 2020 – prior to the meeting on November 23, 2020.

166.    I did not make any comments about BOP or the GEO Group at the November 16, 2020 rally at UC Hastings.

167.    It is unclear what press conference Murtala Lanval is referring to in the incident report. However, since he refers to me being "informed on 1/13/2021" that all press conferences must be approved in advance, I believe he is referring to the press conference which took place on February 2, 2021. That press conference was also about 30 minutes long, which matches the incident report.

168.    I did not identify any BOP or GEO Group staff by name during the press conference on February 2, 2021.

169.    I am a regular contributor to and co-presenter on KPFA Flashpoints, a radio show. I have a segment on the show called the "Flashpoints Bay View Report", which started sometime around mid-November.

170.    I have probably appeared on Flashpoints about ten times from November 2020 to the present.

171.    Some examples of shows I presented on Flashpoints were on January 7, 2021, during the show "Professor Francis Boyle on Why Trump Must Be Removed NOW", December 22, 2020, "Prisons in Alabama and the Pandemic", December 15,

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 23

2020 and December 3, 2020, "COVID-19 and the California Prisons" .


I declare under penalty of perjury that the foregoing is true and correct, except as to those matters stated on information and belief, and as to those matters I believe them to be true. Executed on February 15, 2021 in San Francisco, California.


Signed:   _Keith H. "Malik" Washington*_
Keith H. "Malik" Washington
(*Pronouns: he/him*)


\*      I, Richard Tan, am the ECF user whose identification and password are being used to file the foregoing documents. Pursuant to Civil Local Rule 5.1(i), I hereby attest that concurrence in the filing of these documents has been obtained from each of its signatories.

*Washington v. Federal Bureau of Prisons,* Case No. 4:21-cv-00787-JST
Declaration of Keith H. "Malik" Washington in Support of Plaintiffs' Reply to
Defendants' Opposition to Application for TRO and/or PI - 24

**Exhibit A**

---------- Forwarded message ---------
From: **Mary Ratcliff** <mary@sfbayview.com>
Date: Thu, Dec 24, 2020 at 12:47 PM
Subject: Keith Washington's amended schedule for Dec. 28 through Jan. 3
To: Murtala Lanval <mlanval@geogroup.com>


12/28 Monday 0900-1800
12/29 Tuesday 0900-1800
12/30 Wednesday 0900-1800
12/31 Thursday 1500-2300
1-1-2021 Friday OFF
1-2-2021 Saturday 1000-1900
1-3-2021 Sunday OFF

I hope this will work, Murtala.

Mary Ratcliff
SF Bay View
https://sfbayview.com
Office: 415-671-0789
Cell: 415-216-9432