<div style="float:left">United States District Court<br>Northern District of California</div>

1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    KEITH H. WASHINGTON, et al.,

          Plaintiffs,
8
          v.
9

10   FEDERAL BUREAU OF PRISONS, et al.,

          Defendants.
11

Case No. 21-cv-00787-JST

**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Re: ECF Nos. 7, 27

12

13        In this case, Plaintiffs Keith "Malik" Washington and the San Francisco Bay View

14   National Black Newspaper ("SF Bay View") contend that Defendants Bureau of Prisons ("BOP")

15   and GEO Group, Inc. retaliated against Washington for reporting on the presence of COVID

16   within one of GEO Group's residential reentry centers.  Plaintiffs seek a preliminary injunction

17   preventing Defendants from imposing discipline on Washington for his violations of BOP and

18   GEO Group rules and requiring Defendants to restore good time credits previously taken from

19   Washington as a disciplinary measure for such violations.  ECF Nos. 7, 27.

20        Because Washington has failed to exhaust his administrative remedies and because SF Bay

21   View cannot demonstrate that Defendants would not have imposed discipline on Washington for

22   violations of BOP rules regardless of any alleged retaliatory motive, the Court will deny the

23   motion.

24   **I.    BACKGROUND**[1]

25        Washington is currently serving a twenty-four month sentence based on his 2010

26   conviction in the U.S. District Court for the Southern District of Texas for a supervised release

27

28   _____

[1] The following facts are undisputed unless otherwise noted.

United States District Court
Northern District of California

1    violation concerning bank robbery.  ECF No. 40-1 at 3.  Since September 3, 2020, Washington has

2    resided at the Taylor Street Residential Reentry Center in San Francisco, a halfway house for

3    incarcerated persons who are nearing release from custody.  First Amended Complaint ("FAC"),

4    ECF No. 25 ¶¶ 20-21.  The Taylor Street Center is managed and supervised by GEO Group

5    pursuant to a contract with BOP.  *Id.* ¶ 20.

6           On September 4, 2020, shortly after his arrival at the Taylor Street facility, Plaintiff signed

7    a receipt of handbook form in which he explicitly stated that he had received copies of and read

8    the GEO Group Resident Handbook.  ECF No. 40-1 at 4.  He stated that he understood that any

9    offense committed while at the Taylor Street facility would subject him to sanction under the

10   prohibited acts.  *Id.* at 4-5.  He also received, and acknowledged by his signature, a cell phone

11   memorandum that provided in pertinent part:

> Please remember having a cell phone while you are a resident at
> Taylor Street is a Privilege – not a Right.  The phone is to be used for
> employment purposes, family contact and contact with your non-
> felon friends.  You may not use a cell phone to communicate with
> other residents of the Facility.  Do not record or take pictures at the
> facility. Your phone will be confiscated if you do either.  . . .  The
> phone is subject to search at any time and will be confiscated at any
> time.

17   ECF No. 40-4 at 13.  Washington further received and signed an Employment Agreement, in

18   which he acknowledged that "the Residential Re-entry Staff must be able to contact me at all times

19   and must be aware of my location."  *Id.* at 15.

20          Washington is currently the Editor-in-Chief of the SF Bay View.  FAC ¶ 13.  Since the

21   start of his residency at Taylor Street, Washington has been part of a work-release program which

22   allows him to leave Taylor Street Center Mondays through Saturdays between 7:00 a.m. and 8:00

23   p.m. to work at SF Bay View.  *Id.* ¶¶ 13-14.  Washington's work there includes processing and

24   routing emails and correspondence, developing and writing articles, and building relationships

25   with reporters, editors, and other members of the community.  *Id.* ¶¶ 15-18.  Plaintiffs contend that

26   prior to January 8, 2021, Defendants "placed no restrictions" on Washington's regular contact

27   with the public, journalists, and the news media.  *Id.* ¶ 18.  Plaintiffs also state that they

28   "understood the terms of [Washington's] BOP-approved employment to mean that he could report

2

1    on, and attend, events outside of the SF Bay View offices in the normal course of his job as a

2    journalist and editor for a national Black newspaper." ECF No. 52 at 6; *see also* Washington

3    Decl., ECF No. 55 ¶ 71; Ratcliff Decl., ECF No. 54 ¶¶ 10-11.  They do not provide any evidence,

4    however, that Defendants agreed to these modifications of their rules.

5         On November 14, 2020, Washington attended a march and rally at the San Francisco

6    Federal Building in his capacity as an editor of the SF Bay View.  Washington Decl. ¶¶ 61-63.  On

7    November 16, 2020, Washington attended a rally at U.C. Hastings, again on behalf of SF Bay

8    View.  *Id.* ¶ 64.  Washington made public remarks at both events.  *Id.* ¶¶ 63, 68.  He did not obtain

9    prior permission to be in these locations.

10        Later that month, the GEO Group learned about Washington's attendance at the November

11   14 event.  Richard Decl., ECF No. 40-3 ¶ 10.  Maria Richard, the Facility Director at the Taylor

12   Street Center, brought Washington in for a meeting, and teleconferenced Mary Ratcliff,

13   Washington's supervisor at the SF Bay View.[2]  *Id.* ¶¶ 10-11; Washington Decl. ¶¶ 72-73, 84.  The

14   parties dispute the content of this meeting.  Washington alleges that after confirming his

15   attendance at the November 14 rally, Richard stated that she could "write this incident up with the

16   Bureau of Prisons" and that, if she did, Washington would "go back to prison."  Washington Decl.

17   ¶ 79.  Washington also alleges that he was told by Richard not to talk about BOP or the GEO

18   Group, but that he was never told that he was prohibited from participating in large rallies or

19   group events, or that he needed prior approval before attending off-site work events or to report on

20   BOP or GEO Group issues.  *Id.* ¶¶ 86-91.  By contrast, Richard alleges that she "reminded Ratcliff

21   that Washington is prohibited to attend any off-site work events unless he has prior approval" and

22   that absent such approval "Washington would be considered out-of-bounds and subject to

23   placement on escape status."  Richard Decl. ¶ 11.  Following the meeting, on November 25, 2021,

24   Ratcliff sent a follow-up email acknowledging the media policy and seeking clarification on the

25   procedure to request Washington's attendance at community events.  Ratcliff Decl. ¶¶ 27-37; ECF

26

27   _____

     [2] The parties dispute the date of this meeting.  Defendants contend that the meeting took place
     "[o]n or about November 15, 2020," Richard Decl. ¶ 10, while Plaintiff say that it took place on
28   November 23, 2020, Washington Decl. ¶¶ 72-73; Ratcliff Decl. ¶ 26.

United States District Court
Northern District of California

1    54 at 12-13.  Ratcliff never received a reply.  Ratcliff Decl. ¶ 38.[3]

2         On January 8, 2020, Ratcliff emailed the case manager at Taylor Street Center, seeking

3    permission for Washington to attend a press conference concerning allegations of racism in the

4    San Francisco Health System Service three days later, on January 11.  FAC ¶ 36.  Washington's

5    case manager responded giving approval and explaining that Washington could attend the press

6    conference "since its [sic] in line with his job and its [sic] within his work hours."  *Id.*  Ten

7    minutes later, however, Richard replied to the email chain clarifying that, actually, "BOP has

8    denied this request."  ECF No. 40-4 at 25.  Richard explained that she submitted the request to

9    BOP who "denied it due to time frame," noting that "BOP sends th[ese] request[s] to Central

10   office and needs at least a week."  *Id.*

11        The same day, Washington and other Taylor Street Center residents received a

12   memorandum from Richard explaining that "a few residents and staff . . . have recently tested

13   positive for the Covid-19" ("Richard Memorandum").  FAC ¶ 33.  That evening, Washington

14   texted Tim Redmond, founder of 48Hills.og internet news cite, and told him about the Taylor

15   Street Center COVID outbreak.  *Id.* ¶ 37.  The next morning, Washington spoke to Redmond by

16   phone, and later sent Redmon a link to the Richard Memorandum, which had been posted on

17   Twitter.[4]  *Id.* ¶ 39.  Also on January 9, 2021, the SF Bay View issued a press release about the

18   Taylor Street COVID-19 outbreak.  *Id.* ¶ 40.  Washington wrote the first draft of the press release.

19   Washington Decl. ¶ 134.

20        On January 10, 2021, Will Gomez, Case Manager at the Taylor Street Center, collected

21   and searched the cell phones of Washington, Washington's roommate, and several other residents.

22   FAC ¶ 49.  After 15 minutes, cell phones had been returned to all residents other than Washington,

23   who was told that he was prohibited from using another resident's phone.  *Id.*  This is the first such

24

25   [3] Plaintiffs acknowledge that the email was sent to an incorrect address for Maria Richard, but
     aver that Murtala Lanval, the Job Developer at Taylor Street Center, was copied on the email.
26   Ratcliff Decl. ¶¶ 39-40; FAC ¶ 30.

27   [4] In his declaration, Washington clarifies that, after speaking to Redmond about the outbreak,
     Washington "sent [Redmond], from my phone, a copy of the memorandum about the COVID
28   outbreak."  Washington Decl. ¶ 131.  Later in the afternoon, after the memorandum was publicly
     posted to Twitter, Washington sent Redmond a link to the posting.  *Id.* ¶ 133.

United States District Court
Northern District of California

1    cell phone search that Plaintiffs are aware of within the last six months.  *Id.* ¶ 50.

2    At 5:00 p.m. that day, Gomez issued an Incident Report, charging Washington with

3    Prohibited Act 327 – "Unauthorized Contact with the Public."  *Id.* ¶¶ 51-53.  The Report

4    references Washington's correspondence with Redmond.  *Id.* ¶ 54; ECF No. 25 at 35.  The

5    Incident Report was given to Washington on January 11, 2021, at a discipline meeting with

6    Richard.  FAC ¶ 56; Richard Decl. ¶ 25.  During the meeting, Richard added to the Incident

7    Report a charge of Prohibited Act 297 – "Phone Abuse."  FAC ¶ 58.  Richard explained that, as a

8    result of his violations, Washington would lose 14 days of good time credits and the use of his cell

9    phone for 30 days.  *Id.* ¶ 57; Richard Decl. ¶ 27.  Washington also says that it was at this discipline

10   meeting that Richard gave him the "News Interview Authorization Form" that he was required to

11   fill out any time he wished to have contact with the press.  FAC ¶ 57.  On January 17, 2021, after

12   receiving a copy of the Unit Discipline Committee Report for the charged conduct, Washington

13   filed a BP-9 Request for Administrative Remedy form with the GEO Group.  *Id.* ¶ 62.

14   On February 2, 2021, after filing the complaint in this case, Plaintiffs held a press

15   conference.  *Id.* ¶ 66.  Washington was present at SF Bay View offices for work, and he attended

16   and spoke at the press conference, which was broadcast over Zoom.  *Id.*  The following day,

17   Ratcliff received a phone call from Lanval at Taylor Street Center, inquiring where Washington

18   had been during the February 2 press conference.  *Id.* ¶ 68.  Lanval also inquired about a press

19   conference at U.C. Hastings.  *Id.* ¶ 29.  Plaintiffs believe that Lanval and Defendants undertook an

20   investigation of Washington's public appearances to discover instances for which he could be

21   disciplined as retaliation for the filing of this lawsuit and the press conference.  *Id.* ¶¶ 70-72.

22   At 8:00 p.m. on February 3, 2021, Lanval issued a second Incident Report, charging

23   Washington with Prohibited Act 200 –  "Escape from a work detail"; Prohibited Act 315 –

24   "Participating in an unauthorized meeting or gathering"; and Prohibited Act 316 –  "Being in an

25   unauthorized area without staff authorization."  *Id.* ¶¶ 73-78; ECF No. 25 at 52.  This Incident

26   Report is based on Lanval's review of an online news posting identifying Washington at a

27   "recorded press conference and at a rally sometime[] in December 2020, at the UC Hasting[s]

28   Campus, which he was not authorized to do."  ECF No. 25 at 52.  The Report also states that

*United States District Court*
*Northern District of California*

1    during this event, Washington spoke about Taylor Street Center and BOP, *id.*, although

2    Washington alleges that he spoke for less than three minutes and that he did not mention BOP or

3    Taylor Street Center, FAC ¶ 81.  This Incident Report remains pending.  Richard Decl. ¶ 39.

4           Prior to the imposition of discipline, Washington was scheduled to be released from

5    custody on May 31, 2021.  FAC ¶ 13.  With the loss of 14 days of good time credit, his expected

6    release date is now June 13, 2021.  *Id.* ¶ 57; *see also* ECF No. 40-1 at 3 (Washington has a

7    projected release date of June 13, 2021).

8           Plaintiffs filed their case on February 1, 2021, ECF No. 1, and filed a simultaneous motion

9    for a temporary restraining order and/or order to show cause and for preliminary injunction, ECF

10   No. 7.  On February 5, 2021, Plaintiffs filed the operative FAC, ECF No. 25, and a supplemental

11   motion for a temporary restraining order, ECF No. 27, based on the conduct that had occurred

12   since the filing of the initial complaint and motion.  The same day, the case was reassigned to the

13   undersigned, and the Court held a case management conference.  ECF Nos. 29, 34, 35.  At the

14   conclusion of the conference, Defendants agreed to postpone Washington's disciplinary hearing as

15   to the February 3 Incident Report until the Court decided Plaintiffs' motion for a preliminary

16   injunction.[5]

17          Plaintiffs' motion seeks a preliminary injunction:

18          (1)     ordering Defendants to revoke and remove the disciplinary sanction of the January

19   10 Incident Report from Washington's record;

20          (2)     ordering Defendants to restore Washington's good time credits;

21          (3)     ordering Defendants to revoke and remove the disciplinary charges of the February

22   4 Incident Report from Washington's record; and

23          (4)     enjoining Defendants from bringing further disciplinary against Washington for

24   performing work outside of the SF Bay View offices or the Hope House, speaking to staff at the

25   SF Bay View or other members of the press, reporting on radio or social media, or speaking at

26   rallies and holding press conferences for SF Bay View.

27   _____

28   [5] Plaintiffs' motion argues a likelihood of success only for their retaliation claim.  The Court therefore examines the request for injunctive relief based solely on the strength of that claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   ECF Nos. 7, 27, 58.  Defendants opposed the motion, ECF No. 40, and Plaintiffs filed a reply,

2   ECF No. 52.  The Court heard argument on March 10, 2021.

3   **II.   JURISDICTION**

4        This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5   **III.   LEGAL STANDARD**

6        A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on

7   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

8   balance of equities tips in his favor, and that an injunction is in the public interest."  *Am. Trucking*

9   *Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat.*

10  *Res. Def. Council*, 555 U.S. 7, 20 (2008)).  Injunctive relief is "an extraordinary remedy that may

11  only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555

12  U.S. at 22.

13       To grant preliminary injunctive relief, a court must find that "a certain threshold showing

14  [has been] made on each factor."  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per

15  curiam).  Assuming that this threshold has been met, "'serious questions going to the merits' and a

16  balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

17  injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

18  that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

19  1127, 1135 (9th Cir. 2011).

20       Where a plaintiff seeks a mandatory injunction, as opposed to a prohibitory injunction, the

21  plaintiff must "establish that the law and facts clearly favor her position, not simply that she is

22  likely to succeed."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis omitted).

23  **IV.   DISCUSSION**

24       **A.   Washington's Claim is Unlikely to Succeed on the Merits**

25       The Court finds that Plaintiff Washington's claim is unlikely to succeed on the merits, and

26  that there are not serious questions going to the merits, because he has failed to exhaust his

27  administrative remedies as required by the Prison Litigation Reform Act ("PLRA").

28       The PLRA provides that "[n]o action shall be brought with respect to prison conditions

1    under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or

2    other correctional facility until such administrative remedies as are available are exhausted."  42

3    U.S.C. § 1997e(a).  The exhaustion requirement applies to "federal prisoners suing under *Bivens v.*

4    *Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, (1971), [who] must first exhaust inmate

5    grievance procedures just as state prisoners must exhaust administrative processes prior to

6    instituting a § 1983 suit."  *Porter v. Nussle*, 534 U.S. 516, 524, (2002).  "Failure to exhaust PLRA

7    administrative remedies 'is an affirmative defense the defendant must plead and prove.'"

8    *Espinoza v. Asuncion*, No. 16-cv-01263-LB, 2017 WL 3670780, at *11 (N.D. Cal. Aug. 25, 2017)

9    (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)).  The burden is on the defendant "to prove that

10   there was an available administrative remedy, and that the prisoner did not exhaust that available

11   remedy."  *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).  "Once the defendant has carried

12   that burden . . . '[t]he burden shifts to the plaintiff to rebut by showing that the local remedies

13   were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'"  *Id.* (quoting

14   *Hilao v. Est. of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)).  The ultimate burden of proof,

15   however, remains with defendant.  *Id.*

16         The PLRA's exhaustion requirement is mandatory.  *Porter*, 534 U.S. at 524.  All available

17   remedies must be exhausted; those remedies "need not meet federal standards, nor must they be

18   'plain, speedy, and effective.'"  *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 739-41 & n.5

19   (2001).  Section 1997e(a) requires "proper exhaustion" of available administrative remedies.

20   *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).  Proper exhaustion requires the incarcerated individual

21   to use all steps of the administrative process and comply with "deadlines and other critical

22   procedural rules."  *Id.* at 90.  Even when the prisoner seeks relief not available in grievance

23   proceedings, exhaustion is a prerequisite to suit.  *Booth*, 532 U.S. at 741.  That the administrative

24   procedure cannot result in the particular form of relief requested by the incarcerated person does

25   not excuse exhaustion because some sort of relief or responsive action may result from the

26   grievance.  *Id.* at 737.

27         However, "the exhaustion requirement hinges on the 'availab[ility]' of administrative

28   remedies:  An inmate, that is, must exhaust available remedies, but need not exhaust unavailable

United States District Court
Northern District of California

8

1   ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (alteration in original).  The United States

2   Supreme Court has identified "three kinds of circumstances in which an administrative remedy,

3   although officially on the books, is not capable of use to obtain relief." *Id.* at 1859.  First, "an

4   administrative procedure is unavailable when (despite what regulations or guidance materials may

5   promise) it operates as a simple dead end – with officers unable or consistently unwilling to

6   provide any relief to aggrieved inmates." *Id.* (offering as an example a prison handbook "directing

7   inmates to submit their grievances to a particular administrative office – but in practice that office

8   disclaims the capacity to consider those petitions").  Second, "an administrative scheme might be

9   so opaque that it becomes, practically speaking, incapable of use." *Id.* (offering as an example a

10  situation where "some mechanism exists to provide relief, but no ordinary person can discern or

11  navigate it").  Third, an administrative remedy is not available "when prison administrators thwart

12  inmates from taking advantage of a grievance process through machination, misrepresentation, or

13  intimidation." *Id.* at 1860 (citing as examples *Woodford*, 548 U.S. at 102 and various appellate

14  court cases addressing "a variety of instances in which officials misled or threatened individual

15  inmates so as to prevent their use of otherwise proper procedures").

16        The BOP states, ECF No. 40-1 at 4, and Washington concedes, ECF No. 7 at 30, that he

17  has failed to exhaust his administrative remedies.  Washington argues, however, that exhaustion

18  should be not be required because *Ross*'s "dead end" exception applies given the time required to

19  complete the process. *Id.*; ECF No. 52 at 19.  He states that, under BOP regulations, "appeal of

20  his discipline will take a minimum of 90 days, and a maximum of 160 days."  ECF No. 7 at 30.

21  Accordingly, Washington contends that it is possible that the administrative review process will

22  not be completed until a month or more after his original expected release date. *Id.*  Therefore, he

23  argues, administrative remedies are "unavailable" because mandatory exhaustion "could result in

24  an adjudication of his claim after he has already been released." *Id.* at 31.

25        The cases Washington cites do not support his position.  These cases hold that

26  administrative remedies may be unavailable where the review process "present[s] an imminent

27  danger to an inmate" because of the COVID-19 pandemic. *Sowell v. TDCJ*, No. CV H-20-1492,

28  2020 WL 2113603, at *3 (S.D. Tex. May 4, 2020); *see also Valentine v. Collier*, 140 S. Ct. 1598,

9

1    1601 (2020) (mem.) (discussing a potential "narrow category" of grievance procedures that are

2    "'unavailable' to meet the plaintiff's purposes" of "responding to a rapidly spreading pandemic

3    like Covid-19"). These cases do not apply here: although Washington may have been *reporting*

4    on COVID-19 within a BOP-contracted facility, he does not allege that he is at risk of *contracting*

5    COVID-19 if not excused from exhausting his administrative remedy. In short, his situation does

6    not present an "imminent danger that would lead the Court to find [BOP's] grievance procedures

7    not capable of use and thus unavailable in his case." *See Sowell*, 2020 WL 2113603, at *3.

8            Washington also cites *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) for the proposition that

9    "an administrative procedure is unavailable when (despite what regulations or guidance materials

10   may promise) it operates as a simple dead end." However, *Ross* limits the application of this

11   exception to situations in which "the facts on the ground demonstrate that *no . . . potential* [for

12   relief] exists," because "[t]he modifier 'available' requires the possibility of *some relief*." *Id.*

13   (emphasis added) (citation omitted). That is not the situation here. It is far from certain that the

14   reinstatement of the 14 days of good-time credit Washington lost as part of his first disciplinary

15   sanction will become moot. Additionally, a BOP disciplinary official has testified that he would

16   reverse the finding that Washington committed "phone abuse" in violation of BOP Code 297, one

17   of the charges against him, if the matter were appealed. *See* ECF No. 40-1 at 11-12. Washington

18   invites the Court to hold that whenever there is a possibility that administrative relief will consume

19   so much time that the relief itself will become unobtainable, the relief is "unavailable" for

20   exhaustion purposes. That argument contains a great deal of common sense, but the Court cannot

21   find caselaw to support it.

22           In short, Washington has not shown that Defendants' administrative remedy system is

23   "unavailable" to him. The Court therefore finds that Washington has failed to exhaust his

24   administrative remedies. *See Porter*, 534 U.S. at 524 (remedies must be exhausted even if they are

25   not plain, speedy, or effective); *Booth*, 532 U.S. at 739 ("Congress meant to require procedural

26   exhaustion regardless of the fit between a prisoner's prayer for relief and the administrative

27   remedies possible"). His failure to exhaust administrative remedies means that his First

28

United States District Court
Northern District of California

10

1    Amendment claim of retaliation is unlikely to succeed on the merits and he has not shown serious

2    questions going to the merits.  Washington's request for an injunction is denied.

3                **B.        SF Bay View's Claim is Unlikely to Succeed on the Merits**

4           The Court finds that SF Bay View's retaliation claim is also unlikely to succeed on the

5    merits because it has not shown that Washington would not have been disciplined but for

6    Defendants' alleged retaliatory motive.

7           "'[A]s a general matter the First Amendment prohibits government officials from

8    subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v.*

9    *Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

10   "To state a First Amendment retaliation claim, [a plaintiff] must plausibly allege that (1) she

11   engaged in a constitutionally protected activity, (2) Defendants' actions would chill a person of

12   ordinary firmness from continuing to engage in the protected activity, and (3) the protected

13   activity was a substantial or motivating factor in Defendants' conduct." *Sampson v. County of Los*

14   *Angeles*, 974 F.3d 1012, 1019 (9th Cir. 2020).  "Once a plaintiff has made such a showing, the

15   burden shifts to the government to show that it 'would have taken the same action even in the

16   absence of the protected conduct.'" *O'Brien v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016) (quoting

17   *Pinard v. Clatskanie Sch. Dist. 6J,* 467 F.3d 755, 770 (9th Cir. 2006)).  A plaintiff's ultimate

18   success will depend on whether she can "establish that Defendants' 'retaliatory animus' was the

19   'but-for' cause of her injury, 'meaning that the adverse action against [her] would not have been

20   taken absent the retaliatory motive.'" *Sampson*, 974 F.3d at 1019 (quoting *Nieves*, 139 S. Ct. at

21   1722).  SF Bay View argues that its "protected speech was a 'but for' cause of the retaliation,

22   since the retaliation was solely motivated by the SF Bay View's press release and Mr.

23   Washington's speech to Mr. Redmond concerning the COVID outbreak." ECF No. 7 at 26.

24          To begin with, the parties dispute the burden associated with this element.  The BOP

25   argues that "a prisoner's retaliation claim will fail if . . . there is 'some evidence' to support the

26   disciplinary sanction and there is a 'legitimate penological purpose.'"  ECF No. 40 at 25 (quoting

27   *Newman v. Ponce*, No. 2:18-cv-02348-GW, 2020 WL 653123, at *6 (C.D. Cal. Sept. 25, 2020),

28   *report and recommendation adopted*, No. 2:18-cv-02348 JWH, 2020 WL 6507321 (C.D. Cal.

United States District Court
Northern District of California

1    Nov. 5, 2020)).  In their reply brief, Plaintiffs argue that the Ninth Circuit has held that the "some

2    evidence" standard does not apply to retaliation claims.  ECF No. 52 at 12 (citing *Hines v. Gomez*,

3    108 F. 3d 265 (9th Cir. 1997); *Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003)).  Plaintiffs do

4    not state in their briefs what they believe the burden actually to be, but at the hearing on the

5    motion they identified *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S.

6    274 (1977), a First Amendment employment discrimination case.  The Supreme Court held there

7    that once a plaintiff proves by a preponderance of the evidence that an impermissible motive was a

8    substantial factor in his termination, the defendant can still avoid liability for reinstatement and

9    back pay (compensatory damages as such were not addressed) by proving by a preponderance of

10   the evidence that the employee would have been discharged anyway.  *Id.* at 287.

11         The Court has located authority applying *Mount Healthy* in the prison disciplinary context.

12   In *Riley v. Roach*, 572 F. App'x 504 (9th Cir. 2014), plaintiff brought a Section 1983 action

13   alleging that prison officials retaliated against him for filing a grievance.  The Ninth Circuit held

14   that once plaintiff showed that his protected conduct was the substantial or motivating factor

15   behind the defendant's conduct, "[t]he burden then shifts to Officer Roach to show 'by a

16   preponderance of the evidence that [he] would have" taken the same action "even in the absence

17   of the protected conduct.'"  *Id.* at 506 (quoting *Mt. Healthy*, 429 U.S. at 287).  The Court therefore

18   applies that standard here.

19         Nonetheless, even applying this more generous standard, and assuming for the sake of

20   argument that Plaintiffs have shown Washington's speech activities were a substantial or

21   motivating factor behind Defendants' actions, the Court finds that Defendants have demonstrated

22   that they would have disciplined Washington regardless of any retaliatory motive.  As a result, SF

23   Bay View has not shown that Defendants' retaliatory animus was the "but-for" cause of its injury.

24   *See Sampson*, 974 F.3d at 1019.

25         It is not disputed that Washington engaged in numerous instances of prohibited conduct.

26   Defendants identify seven different violations of BOP rules or policies, ECF No. 40 at 14-16, none

27   of which Washington denies and most of which he admits.  *See, e.g.*, Washington Decl. ¶¶ 61-71

28   (describing his attendance at off-site events); *id.* ¶¶ 129-31, 133 (describing communications with

United States District Court
Northern District of California

1    Redmond, including sending a copy of the Richard Memorandum).  As someone in BOP's

2    custody, Washington is subject to BOP rules and is liable to be disciplined for the violation of

3    those rules.  *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("A prison inmate retains those first

4    amendment rights that are not inconsistent with his status as a prisoner or with the legitimate

5    penological objectives of the corrections system.").

6            Plaintiffs argue that Defendants enforced the rules selectively.  *See* FAC ¶ 61 ("Plaintiff

7    Washington was the only resident charged with violation of Prohibited Act 297 ('Phone Abuse')

8    out of all the residents whose phones were the subject of the above alleged search and seizure.");

9    *id.* ¶ 72 ("Defendant Lanval's investigation was undertaken solely in response to the press

10   conference of February 2, 2021, that such investigations are not routine, and that no comparable

11   investigations had been made by Taylor Street Center staff prior to this occasion.").  But he

12   identifies no instance of someone else engaging in the same or similar conduct and not receiving

13   discipline.  For example, Plaintiffs introduce no evidence or reason to infer that any other residents

14   had committed phone abuse violations.  The Court therefore cannot conclude on this record that

15   Defendants would not have disciplined him in any event.  *See Am.-Arab Anti-Discrimination*

16   *Comm. v. Reno*, 70 F.3d 1045, 1063 (9th Cir. 1995) ("Crucial to the analysis [for a selective

17   enforcement retaliation claim] is the establishment of the appropriate control group – a group that

18   is similarly situated in all respects to those who claim selective enforcement, except for the

19   attribute on which the selective enforcement claim rests.").

20           For these reasons, Plaintiff SF Bay View has not demonstrated likely success on the

21   merits, or serious questions going to the merits, by showing that any retaliatory motive on

22   Defendants' part was the "but for" cause of the discipline against Plaintiff Washington, nor has it

23   shown that "the law and facts *clearly favor* [its] position," as required to obtain the requested

24   relief.  *Garcia*, 786 F.3d at 740 (emphasis in original).  Accordingly, its motion for injunction is

25   also denied. [6]

26

27

28   [6] In light of this conclusion, the Court declines to reach the parties' remaining arguments,
     including whether the BOP rules and regulations place an impermissible burden on speech.

United States District Court
Northern District of California

13

1

**CONCLUSION**

2    For the foregoing reasons, the motion for preliminary injunction is denied.

3    **IT IS SO ORDERED.**

4    Dated:  March 11, 2021



5                                                    _____
                                                     JON S. TIGAR
6                                                    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28